[L. A. No. 20727. In Bank. Apr. 11, 1950.]

Estate of RUBY SARGAVAK, Deceased. J. G. OHANNE-
SON et al., Respondents, v. ADRINE LAMBRINIDOU
et al., Appellants; H. KURKJIAN et al., Contestants and
Respondents.

Robert M. Dulin, Melvin E. Fink, Spurgeon Avakian and Schell & Delamer for Appellants.

C. W. Byrer, Charles E. Hobart, Cameron & Perkins and W. E. Cameron for Respondents.

THE COURT.—Contestants appeal from an order admitting a holographic instrument to probate as a codicil to a previously admitted witnessed will. Ruby Sargavak died March 22, 1947. By a formal will drawn by respondent Ohanneson as her attorney and executed July 9, 1945, she left all her property to the appellants. Respondent Mahdesian, as executor under that will, offered it for probate on March 31, 1947. On May 6, 1947, respondent Ohanneson offered the following instrument for probate as a codicil to that will:

"1566 W-29th St.
Los Angeles 7, Cal.
Sep 29, 1946
Sunday Evening

To Whom It May Concern:

I the writer—Mrs Ruby Sargavak wants everyone to know that she is writing these lines of her own free will—no one is putting her of or urging her to do it. She leaves everything she has to her Boy Sam Mahdesian & her layer, J. G. Ohanneson—she gives them power of attorney to divide what is left of her belongings to them. She specifically advises to give nothing what so ever to Mrs. Lillian Shooshan—she is no relation nor friend of hers—Mrs. Sargavak has been more than kind to her, just because she begged us to help her for a little time—Mrs. Sargavak would rather help her very own nieces & grand nieces & perfect strangers, who are truly in need of help. God has been good to us, she did not appreciate

the goodness of the Lord to her. All honor & glory unto his High and Holy Name! Mrs. Ruby Sargavak.

P. S. It is 8 o'clock, I am very tired——

Ruby Sargavak.''

Appellants contested the admission of this instrument on the ground that testatrix did not intend it as a testamentary disposition of her property. They introduced without objection evidence to show that testatrix intended the instrument as an authorization to respondents to eject Mrs. Lillian Shooshan from the testatrix's house. Respondent Mahdesian testified to declarations of the testatrix that the allegedly dispositive provisions were intended only as a statement that her attorney and her executor were to dispose of her property according to the terms of the will of July 9, 1945. Respondent Ohanneson, as the only proponent of the codicil, offered no contradictory evidence, relying solely upon the allegedly clear language of the instrument. The trial court found that the instrument was executed with testamentary intent and admitted it to probate as a codicil to the will.

No question is raised as to compliance with Probate Code, section 53, or as to Mrs. Sargavak's testamentary capacity. Appellants contend only that the uncontradicted evidence clearly discloses that the testatrix did not execute the instrument with testamentary intent. Respondent, however, urges that the extrinsic evidence was improperly admitted and could not be considered on that issue. He contends that when a will is clear and unambiguous on its face, extrinsic evidence cannot be admitted to show that it was not a will. This contention cannot be upheld.

Before an instrument may be probated as a will it must appear from its terms, viewed in the light of the surrounding circumstances, that it was executed with testamentary intent. The testator must have intended, by the particular instrument offered for probate, to make a revocable disposition of his property to take effect upon his death. (*In re Richardson,* 94 Cal. 63 [29 P. 484, 15 L.R.A. 635] ; *Estate of Spencer,* 87 Cal.App.2d 591 [197 P.2d 351] ; *Habergham* v. *Vincent,* 2 Ves.Jr. 204; *Succession of Torlage,* 202 La. 693 [12 So.2d 683] ; *Mayhew* v. *Wilhelm,* 249 Mich. 640 [229 N.W. 459] ; *In re McCune's Estate,* 265 Pa. 523 [109 A. 156] ; *Estate of Button,* 209 Cal. 325, 331 [287 P. 964] ; *In re Williams' Estate,* (Tex.Civ.App.) 135 S.W.2d 1078; *Clark* v. *Hugo,* 130 Va. 99 [107 S.E. 730] ; Thompson, Wills, § 12.)

It bears emphasis that we are here concerned not with the meaning of the instrument, but with the intention with which it was executed.* ■ Regardless of the language of the allegedly testamentary instrument, extrinsic evidence may be introduced to show that it was not intended by the testator to be effective as a will. (*Estate of Janes,* 18 Cal.2d 512, 515 [116 P.2d 438]; *Austin* v. *First Trust & Savings Bank,* 343 Ill. 406, 414 [175 N.E. 554]; *In re Kemp's Will,* 37 Del. 514, 523 [186 A. 890]; *In re Estate of Soper,* 196 Minn. 60 [264 N.W. 427]; *Estate of Kenyon,* 42 Cal.App.2d 423 [109 P.2d 38].) Thus, an instrument that clearly appears testamentary may nevertheless be shown by extrinsic evidence to have been executed in jest (*Nichols* v. *Nichols,* 2 Phill.Ecc. 180; *Trevelyan* v. *Trevelyan,* 1 Phill.Ecc. 149), or as a threat to induce action by an interested party (*Lister* v. *Smith,* 3 S.&T. 282), or under the misapprehension that the instrument was a mortgage (*In re Williams' Estate* (Tex.Civ.App.), 135 S.W.2d 1078), or to induce the ''legatee'' to engage in illicit relations with the testator (*Fleming* v. *Morrison,* 187 Mass. 120 [72 N.E. 499]), or to relieve the maker from annoyance by a would-be legatee. (*Estate of Siemers,* 202 Cal. 424, 435 [261 P. 298]; see 1 Page, Wills, § 53.)

Respondent relies upon a dictum in *Estate of Pagel,* 52 Cal.App.2d 38, 42 [125 P.2d 853], that, although extrinsic evidence can be admitted to show that the writer did not intend the writing in question to operate as a will, such evidence cannot be admitted to show that he intended it to operate as an instrument different from what on its face it purports to be. Respondent therefore contends that the evidence is inadmissible because it shows that the testatrix intended to execute a power of attorney. ■ The intention of the testatrix is here material only in showing that she did not intend that the instrument operate as a will. Since extrinsic evidence is admissible to show the absence of testamentary intention, it does not become inadmissible because it does so by showing another intention.

■ The extrinsic evidence in this case consists for the most part of the oral declarations of the testatrix before and after the execution of the instrument in question. Such declarations,

*There is an analogy in the use of extrinsic evidence, including subsequent acts and declarations of the grantor, to prove delivery of a deed, likewise turning on a question of intention independent of the terms of the deed itself. (*Whitlow* v. *Durst,* 20 Cal.2d 523, 524-525 [127 P.2d 530]; *Donahue* v. *Sweeney,* 171 Cal. 388, 391-392 [153 P. 708]; *Williams* v. *Kidd,* 170 Cal. 631, 642 [151 P. 1, Ann.Cas. 1916E 703].)

whether made at, before, or after the execution of the instrument are admissible, if offered for the purpose of ascertaining the intent with which the instrument was executed (*Estate of Siemers*, 202 Cal. 424, 435-436 [261 P. 298]; *In re Kemp's Will*, 37 Del. 514, 523 [186 A. 890]; *Fleming* v. *Morrison*, 187 Mass. 120, 122 [72 N.E. 499]; *Clark* v. *Hugo*, 130 Va. 99 [107 S.E. 730, 734]; 6 Wigmore, Evidence, § 1736, p. 111; 1 Underhill, Wills, § 39, p. 48), and not for the purpose of proving the meaning the testator attributed to specific provisions of an admitted will. (*Colton* v. *Colton*, 127 U.S. 300 [8 S.Ct. 1164, 32 L.Ed. 138]; *Estate of Pierce*, 32 Cal.2d 265, 274 [196 P.2d 1]; *Estate of Farelly*, 214 Cal. 199, 203 [4 P.2d 948]; Prob. Code, § 105.) "Such . . . declarations of intent to make a will are admissible when the attempt is not to explain an ambiguity but to show the testamentary character of a letter." (*Estate of Spies*, 86 Cal.App.2d 87, 91 [194 P.2d 83]; *Estate of Janes*, 18 Cal.2d 512, 516 [116 P.2d 438]; *Estate of Siemers*, 202 Cal. 424, 435 [261 P. 298]; *Estate of Morrison*, 198 Cal. 1, 6-8 [242 P. 939]; *Estate of Spitzer*, 196 Cal. 301, 306 [237 P. 739].)

*Estate of Smith*, 31 Cal.2d 563 [191 P.2d 413], is not inconsistent with the foregoing. That case involved an unequivocal express revocatory intent unaccompanied by any declaration or conduct of the decedent inconsistent therewith. There was no evidence against the showing of the solemnly expressed intent coexistent with the execution of the revocatory instrument. The evidence established only that testatrix informed other persons that she had made a will, the provisions of which were those of the instrument offered for probate. She did not refer to the earlier revocation and offered no explanation of her purpose in writing it. A written revocation can be overcome only by evidence that revocation was not intended, not by evidence that at some later time the testatrix wished the will to be operative. The evidence of the decedent's subsequent oral declarations and conduct was held inadmissible because it had no bearing or relevancy under the facts to show an intent different from that unequivocally expressed by the revocatory writing. None of it disclosed conduct, or influences, or state of mind at the time of the written revocation. Nor did the declarations refer to the previous revocation. The evidence there relied on merely supported an *inference* that the decedent considered her will operative. The majority of

this court expressly recognized that the effect of such a duly executed express revocatory instrument could not thus be overcome.

This appeal does not present a case in which the trial court erroneously excluded relevant extrinsic evidence. The evidence was admitted and considered by the trial court in determining whether the instrument offered for probate was executed with testamentary intent. The trial court concluded that "said decedent executed said instrument of date of September 29, 1946, with the intention to create a revocable disposition of her property to accrue and take effect only upon her death and passing no present interest" and that "said intent to make such testamentary disposition of her property existed at the time of the execution of said instrument."

■ It is true, as contestants assert, that the evidence of decedent's declarations relative to the execution of the instrument is uncontradicted and unimpeached. This evidence, however, is not so persuasive and unequivocal that it compels the conclusion that decedent did not intend to make the testamentary disposition of her property that the instrument directs. It only creates a conflict with other evidence introduced at the trial that supports the finding of the trial court.

Mrs. Lillian Shooshan was the niece of testatrix's deceased husband; she had been living with the testatrix on hostile terms. On the day the instrument was written she had been particularly quarrelsome, insisting that she had been wrongfully excluded from the wills of the testatrix and her husband. According to the testimony of her nurse, Mrs. Sargavak determined to have Mrs. Shooshan ejected from her house, and called respondent Mahdesian for that purpose. When she learned that he could not come that evening, she wrote the instrument in question. The nurse testified in detail concerning the circumstances under which it was written:

"Q. Did you call Mr. Mahdesian at that time? A. I called him that night. She asked me to call him and come and have them put out of the house.

"Q. By referring to them, who did she mean? A. Mrs. Lillian Shoostian [Shooshan] and Betty, her daughter.

"Q. You did call Mr. Mahdesian at her request? A. I did, and she called him also.

"Q. She called him? A. Yes.

"Q. Do you know what she said to him? A. She asked him

to come over; she wanted these parties put out of her house because they had disturbed her so all day.''

The nurse also testified:

''She said she had been so disturbed that day and was so very tired and worn out from trouble she had annoying her all day long with her niece and her niece's daughter; that she didn't want them to be in her will at all, and she was writing this to fix it so they would know she didn't want them to have anything to do with her will.''

Respondent Mahdesian saw the testatrix the next day and discussed the situation with her (Rep. Tr., pp. 27-29):

''Q. What happened when you got there Monday morning? A. It was just around eleven o'clock when I got there Monday morning and greeted her. She was in bed.

''Q. She says 'Where have you been? Why didn't you come yesterday?' Which I gave her the reason why I didn't. 'Well,' she says, 'I want you to help me. Don't you know I am in trouble?'

''I said, 'Now let me worry about your troubles. What is it?'

''She said, 'I want you to get Mrs. Shoostian out of the house right away. I can't stand her any more.'

''I said, 'What is the trouble?'

''She said, 'She is always harassing me, nagging me, and telling me why we didn't leave anything for her in Harry's will, her uncle's will; why we gave so much money to the churches and benevolent organizations,' and she said, 'That disturbs me. So I told her that is my own money. We can do whatever we want with our money.' She says, 'Again yesterday she disturbed me and quarreled with me all day, so I have written something over here. I want you to take it and read it.'

''So I read it. I said, 'What do you want us to do?'

''She said, 'Put Lillian Shoostian out of the house right away.'

''I said, 'Mrs. Sargavak, Mrs. Shoostian [Shooshan] is your husband's niece. He has just passed away a short time ago, and if we put her out of the house people will say she was waiting for her husband to die to put the relatives out.' I said, 'I will handle Mrs. Shoostian. Just leave that to me.'

''She said, 'Well, you know what best to do.'

''Now then, I looked at the instrument and I said, 'What do you want me to do with this?'

"She said, 'As I told you, Mrs. Shoostian has been bothering me and demanding money from me, and I am writing this and I want you to take it and any time you need it to use it.'

"I said, 'Now what do you mean by this, that you want to leave your belongings to your son, Sam Mahdesian and her attorney, J. George Ohanneson and give them power of attorney?'

"Well, she said, 'You are the executor of Harry's estate, and also you are the executor in my will, and Mr. Ohanneson is our attorney. I want you folks to prepare and take care of my estate, my affairs, in the way that you know I want it. And whenever Lillian Shoostian ever gives any trouble, I want you to have this.'"

The foregoing testimony indicates only that decedent's annoyance with Mrs. Shooshan and her daughter prompted the writing of the instrument. If it was intended, as contestants assert, only as a notification to Mrs. Shooshan and her daughter that decedent "didn't want them to be in her will at all," the testimony offers no explanation for the statement that "She leaves everything she has to her Boy Sam Mahdesian & her *layer* J. G. Ohanneson." Nothing in the evidence before the trial court clearly negatives the testamentary implication carried by those words. The impulse that prompted decedent to exclude Mrs. Shooshan from any share in her estate does not dispel the inference that at the same time she directed the disposition of her property to the two men who had served her and her husband as friends, counsel, and business advisers.

Although the testimony of Mahdesian and the nurse is uncontradicted, other evidence introduced at the trial supports the inference that Mrs. Sargavak intended to make the disposition of her property manifested by the terms of the instrument. Decedent and her husband knew Mahdesian since 1906. They frequently referred to him as "our boy" and "our son" and relied upon his aid and advice in the conduct of business matters. At the time she wrote the instrument offered for probate, decedent contemplated transferring title to her home to Mahdesian if he and his wife would live with her. Decedent and her husband knew Ohanneson since 1904. Ohanneson met and courted his wife at their home. Mrs. Sargavak assisted in the delivery of Mrs. Ohanneson's first child in 1913. Ohanneson represented the Sargavaks as their attorney. He was closely associated with Mr. Sargavak in religious and charitable activities. He was a constant visitor at Mrs.

Sargavak's bedside during the extended illness that eventually caused her death.

It cannot be said that it is unreasonable upon this evidence to conclude that Mrs. Sargavak, angered and harassed by Mrs. Shooshan, decided to leave her property to two men she had known for more than forty years and for whom she had demonstrated a warm personal affection. This purpose is clearly expressed by the terms of the instrument. It is not negatived by evidence that she had an additional purpose, expressed in the letter and corroborated by the testimony upon which contestants rely, to avoid further annoyance from Mrs. Shooshan. The inclusion of nontestamentary provisions with those of a testamentary nature does not make the instrument inoperative as a will. (*Estate of Button,* 209 Cal. 325, 331 [287 P. 964].)

The order admitting the instrument to probate is affirmed.

SCHAUER, J.—I concur. It should be noted, however, that the majority holding here that "Regardless of the language of the allegedly testamentary instrument, extrinsic evidence may be introduced to show that it was not intended by the testator to be effective as a will . . . Since extrinsic evidence is admissible to show the absence of testamentary intention, it does not become inadmissible because it does so by showing another intention," is irreconcilably inconsistent with the majority holding in *Estate of Smith* (1948), 31 Cal.2d 563, 568 [191 P.2d 413], that evidence of "extraneous occurrences and declarations claimed to bear upon the intent to revoke" should not be received, "cannot overcome the valid [on its face] express revocation," and is "not admissible to show that an express [on its face] revocation clause was not intended to revoke a prior will."

There has been suggested no tenable basis for applying an exclusionary rule of evidence to the question of intent arising in the Smith case and a contrary rule to the same question in the case now before us. For the sake of uniformity of decision, either the majority holding of the Smith case should be squarely overruled or it should be followed here and all evidence on the subject of intent be held inadmissible.

TRAYNOR, J.—I dissent.

I concur in the opinion of the court that resort may always be had to extrinsic evidence to explain the actual intention

with which an apparently testamentary instrument was executed and that the trial court properly admitted such evidence. In my opinion, however, that evidence, unequivocal, uncontradicted, and unimpeached, clearly demonstrates that Mrs. Sargavak did not intend by the letter of September 29, 1946, to direct the testamentary disposition of her property and the letter should not have been admitted to probate.

It is held that since the letter furnishes rational support for the finding of the trial court that it was executed with testamentary intent, the finding must be affirmed on appeal. The cases cited for the proposition that the extrinsic evidence was properly admitted, however, are also authority for the proposition that a finding of testamentary intent contrary to that evidence cannot be upheld even though it is supported by the terms and appearance of the questioned instrument. If the instrument cannot reasonably be found to be testamentary when read alone, there is no need to resort to extrinsic evidence. In most of the cited cases, not only was the language of the instrument indicative of testamentary intent, it was not indicative of any other. Nevertheless, when the evidence clearly demonstrates that the instrument so construed does not represent the true intention of the writer, it must be denied probate. (*Estate of Kenyon,* 42 Cal.App.2d 423, 425 [109 P.2d 38] ; *Estate of Major,* 89 Cal.App. 238, 242 [264 P. 542] ; *Smith* v. *Smith,* 112 Va. 205 [70 S.E. 491] ; *Rennie* v. *Washington Trust Co.,* 140 Wash. 472 [249 P. 992] ; see 1 Underhill, Wills, § 39, pp. 47-48.) Thus in the case of a law student who draws a practice will solely as a classroom exercise, uncontradicted evidence of this fact by the instructor and members of the class would overcome any indication of testamentary intent from the instrument itself. Although such an instrument might be written meticulously and in strict conformity with statutory requirements, it would not be entitled to probate, since the writer would not intend that it accomplish a testamentary disposition of his property.

Sometimes extrinsic evidence offered to contradict the apparently testamentary character of an instrument establishes that the decedent executed the instrument written in terms not his own, the legal import of which he neither realized nor intended, as in *In re Williams' Estate* (Tex.Civ. App.), 135 S.W.2d 1078, where the decedent executed the instrument under the impression that it was a mortgage. Again, the evidence may establish that the decedent executed an instrument that met the formal requirements for a will,

even that he intended that the instrument appear to be a will, but that his actual design was not that the instrument have testamentary effect, but that it serve a nontestamentary purpose not embodied in the instrument. (*Lister* v. *Smith,* 3 S.&T. 282; *Estate of Siemers,* 202 Cal. 424, 435 [261 P. 298]; *Fleming* v. *Morrison,* 187 Mass. 120, 123 [72 N.E. 499].) In *Fleming* v. *Morrison, supra,* the decedent, to induce a young woman to engage in illicit relations with him, executed a formal witnessed instrument designed to appear as a will, naming her as sole legatee. He showed it to her as his will, intending actually that it have no testamentary effect. The trial court, relying upon the testamentary appearance of the instrument, admitted it to probate. The appellate court reversed the order of admission, holding that it was error for the trial court to attribute any weight to the testamentary appearance of the instrument, since the decedent did not intend the instrument to be testamentary. (See, also, *Estate of Kenyon,* 42 Cal.App.2d 423, 425 [109 P.2d 38].) In each of the foregoing cases, the writer of the instrument did not thereby express or intend to express his actual intention; the terms of the instrument were designed to have no operative effect. The courts have therefore consistently held that when the evidence of the writer's actual intention is clear, convincing, and uncontradicted it is error to rely on evidence of a contrary intention appearing from the terms of the instrument alone. (*Clark* v. *Hugo,* 130 Va. 99 [107 S.E. 730, 733]; *In re Williams' Estate* (Tex.Civ.App.), 135 S.W.2d 1078, 1082; *Estate of Kenyon,* 42 Cal.App.2d 423, 425 [109 P.2d 38]; *Rennie* v. *Washington Trust Co.,* 140 Wash. 472, 479 [249 P. 992]; *In re Willing's Estate,* 212 Pa. 136 [61 A. 812, 814]; *Succession of Torlage,* 202 La. 693, 698.)

Often, however, the evidence will indicate that the decedent sought to accomplish a specific purpose by the terms of the instrument and that this intention was expressed, although imperfectly, by the words chosen, but that the intention was nontestamentary. That is this case. The court cannot disregard the terms of the instrument but must construe them together with the extrinsic evidence to determine their meaning. When the construction of the instrument is based solely on its terms without the aid of extrinsic evidence, or with the aid of extrinsic evidence that is without conflict, "it is the duty of the appellate court . . . to interpret the document independent of the construction given to it by the trier of

the fact, and to make a final determination in accordance with the applicable principles of law." (*Estate of Norris,* 78 Cal. App.2d 152, 159 [177 P.2d 299]; *Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Union Oil Co.* v. *Union Sugar Co.,* 31 Cal.2d 300, 306, 318 [188 P.2d 470]; *Trubowitch* v. *Riverbank Canning Co.,* 30 Cal.2d 335, 339 [182 P.2d 182]; *Western Coal & Mining Co.* v. *Jones,* 27 Cal.2d 819, 826-827 [167 P.2d 719, 164 A.L.R. 685]; *First Trust & Savings Bank* v. *Costa,* 83 Cal.App.2d 368, 372 [188 P.2d 778]; *Estate of O'Brien,* 74 Cal.App.2d 405, 407 [168 P.2d 432]; *Lane-Wells Co.* v. *Schlumberger Well Surveying Corp.,* 65 Cal.App.2d 180, 184 [150 P.2d 251]; *Moffatt* v. *Tight,* 44 Cal.App.2d 643, 648 [112 P.2d 910]; *Landres* v. *Rosasco,* 62 Cal.App.2d 99, 105 [144 P.2d 20].)

In the present case, the extrinsic evidence is clear and unequivocal, uncontradicted and unimpeached. It demonstrates unmistakably that Mrs. Sargavak did not intend to direct a testamentary disposition of her property by the letter offered for probate. On the basis of that evidence, the letter should be denied probate notwithstanding the contrary finding of the trial court. (See *In re Kimmel's Estate,* 278 Pa. 435 [123 A. 405, 406].)

The testimony of Mrs. Sargavak's nurse, set forth at length in the opinion of the court, demonstrates that the only motive for writing the letter was nontestamentary. No other construction can reasonably be placed on the testimony that:

"She said she had been so disturbed that day and was so very tired and worn out from trouble she had annoying her all day long with her niece and her niece's daughter; that she didn't want them to be in her will at all, and she was writing this to fix it so they would know she didn't want them to have anything to do with her will."

Mrs. Sargavak again stated her motive for writing the letter, to respondent Mahdesian the following day:

"She said, 'She is always harassing me, nagging me, and telling me why we didn't leave anything for her in Harry's will, her uncle's will; why we gave so much money to the churches and benevolent organizations,' and she said, 'That disturbs me. So I told her that is my own money. We can do whatever we want with our money.' She says, 'Again yesterday she disturbed me and quarreled with me all day, so I have written something over here. I want you to take it and read it.'

As Mahdesian's testimony quoted in the opinion of the

court indicates, Mrs. Sargavak wrote the letter with reference to the provisions of an existing will, to inform Mrs. Shooshan that she would receive nothing thereunder, and to empower Mahdesian to eject Mrs. Shooshan from her house. That she did not also intend thereby to direct the disposition of her property to Mahdesian and Ohanneson is unequivocally demonstrated by her answer to Mahdesian's query with respect to the allegedly dispositive provision:

"I said, 'Now what do you mean by this, that you want to leave your belongings to your son, Sam Mahdesian and her attorney, J. George Ohanneson and give them power of attorney?'

"Well, she said, 'You are the executor of Harry's estate, and also you are the executor in my will, and Mr. Ohanneson is our attorney. I want you folks to prepare and take care of my estate, my affairs, in the way that you know I want it. And whenever Lillian Shoostian ever gives any trouble, I want you to have this.' "

The declarations of the decedent before and after she wrote the letter preclude an inference that she intended thereby to make a testamentary disposition of her property. She had already executed a formal witnessed will dated July 9, 1945. In her conversations with the nurse and with Mahdesian she continually referred to "my will," demonstrating her conviction that it was still operative.

It is undisputed that decedent's annoyance with Mrs. Shooshan and her daughter prompted the writing of the letter. That letter was intended as a notification to Mrs. Shooshan that she and her daughter would receive nothing under decedent's will. That purpose is clearly established by her statement to the nurse "that she didn't want them to be in her will at all, and she was writing this to fix it so they would know that she didn't want them to have anything to do with her will." To accomplish her purpose, Mrs. Sargavak did not have to change her will, since neither Mrs. Shooshan nor her daughter were mentioned therein. Her reference to the letter as a notification to Mrs. Shooshan and her daughter that she did not want them "to have anything to do with her will" demonstrates that she meant to affirm her will, not to revoke it. The existence of a previously executed and unrevoked formal will, to which the testatrix continually referred and which she still considered operative, reinforces the conclusion that she did not intend its revocation by an informal letter

that made no reference thereto. (*Estate of Spencer,* 87 Cal. App.2d 591, 598 [197 P.2d 351]; *White* v. *Deering,* 38 Cal. App. 433, 438 [177 P. 516]; *Estate of Branick,* 172 Cal. 482 [157 P. 238]; *Estate of Hughes,* 140 Cal.App. 97, 100-101 [35 P.2d 204].)

This interpretation is confirmed by Mahdesian's uncontradicted testimony as to her explanation of the provision in the letter that she left everything to him and Ohanneson. Although that provision could be deemed dispository if it stood alone (*cf., McCloskey* v. *Tierney,* 141 Cal. 101, 102 [74 P. 699, 99 Am.St.Rep. 33]; *Innes* v. *Potter,* 130 Minn. 320 [153 N.W. 604]), her explanation that "You are the executor of Harry's estate, and also you are the executor in my will, and Mr. Ohanneson is our attorney. I want you folks to prepare and take care of my estate, my affairs, in the way that you know I want it" establishes that she wished her executor and her attorney to administer her estate under the terms of the will with which as executor and draftsman, respectively, they were familiar. Mahdesian was then acting as executor of her husband's will, and she was aware of an executor's responsibility for the administration of an estate until final distribution. Her purpose was not to make her executor and her attorney her legatees, but to provide them with an instrument that would demonstrate to Mrs. Shooshan that the latter would get none of the property that they were to distribute under her will.

The evidence makes it clear that Mrs. Sargavak did not intend to revoke her will, for her statements demonstrate that she regarded that will as still operative. Such was Mahdesian's understanding of her statements, although he would have been materially benefited by the interpretation urged by respondent Ohanneson. After the death of Mrs. Sargavak, Mahdesian tried unsuccessfully to get Mrs. Shooshan to leave the house, and then consulted Ohanneson as the decedent's attorney:

"Then I called the attention of this to Mr. Ohanneson, 'Mrs. Shoostian refuses to leave, and here is a paper written by Mrs. Sargavak to the effect that Mrs. Shoostian is not to get anything.'

"Then Mr. Ohanneson looked at it, studied it. 'No,' he said, 'Sam, that has another meaning, too.' He says, 'You and I are becoming the heirs to her estate.'

"My attitude in the matter was—I said, 'George, I cannot have a share in a thing like this.' I said, 'You have drawn Mr. Sargavak's and Mrs. Sargavak's will. You know what their desire was. You know what their wishes were. Mr.

Sargavak earned that money and he has passed away, and I cannot give an interpretation to this power of attorney in this way. I cannot have any share.'

"Well, he says, 'that is up to you. If you don't want to have a part to it, you can waive your claim, but this is a codicil, and half of it comes to you and half of it comes to me, and I am going to get my share.'

"My next statement to him was, 'George, when I shave in the morning I want to respect myself when I look in the mirror, and I can't do it taking advantage of a thing like this.' "

The trial court could not have reached its conclusion without disregarding the foregoing evidence. A trier of fact may disbelieve unimpeached testimony when its disbelief is warranted by the motives or interest of the witness or by contradictions appearing in the evidence (*Huth* v. *Katz,* 30 Cal.2d 605, 609 [184 P.2d 521]), but here there is no basis for disbelief. The nurse had no apparent motive for falsifying her testimony, and respondent suggests none. Mahdesian would have been a legatee of an estate worth approximately $24,000 if the letter were admitted to probate; he had nothing to gain by testifying to circumstances establishing that it was not intended as a will. The testimony of both witnesses was completely consistent with all the evidence adduced at the trial. Respondent offers no ground upon which the testimony could be disbelieved, nor does he even contend that it was false. "Testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact." (*Gomez* v. *Cecena,* 15 Cal.2d 363, 366 [101 P.2d 477] ; *Southern Pac. Co.* v. *Railroad Com.,* 13 Cal.2d 125, 129 [87 P.2d 1052] ; *Nye & Nissen, Inc.* v. *Central Surety & Insurance Corp.,* 71 Cal.App.2d 570, 576-577 [163 P.2d 100] ; *Fidelity & Casualty Co.* v. *Abraham,* 70 Cal.App.2d 776, 782 [161 P.2d 689] ; *Cowan* v. *Hill,* 109 Cal.App. 656, 658 [293 P. 871].) An examination of the letter in the light of the evidence leaves no room for any conclusion other than that it was not written with testamentary intent. I would therefore reverse the order admitting the letter to probate.

Shenk, J., and Edmonds, J., concurred.

Appellants' and contestants and respondents' petitions for a rehearing were denied May 8, 1950. Shenk, J., Edmonds, J., and Traynor, J., voted for a rehearing.