660 P.2d 124

**In the Matter of the ESTATE OF Pat H. KELLY, Deceased.**

**Emma K. MILLS, Appellant,**

v.

**Kenneth KELLY, Appellee.**

**No. 5837.**

Court of Appeals of New Mexico.

Feb. 3, 1983.

Stephen E. Hosford, Martin, Cresswell & Hubert, P.A., Las Cruces, for appellant.

Bruce C. Redd, Albuquerque, for appellee.

## OPINION

DONNELLY, Judge.

Appellant, Emma Mills appeals from an order granting summary judgment and which denied admission to probate of a purported handwritten will of Pat H. Kelly, deceased.

On appeal, the sole issue asserted by appellant is that the entry of summary judgment was improper because of the existence of genuine issues of material fact regarding the proper execution and legal sufficiency of the purported last will and testament of decedent. We reverse.

Pat H. Kelly executed a formal will dated October 18, 1974, prepared by an attorney and which left all of his real, personal or mixed property to his nephew, Kenneth Kelly. In the late fall of 1980, decedent was hospitalized in Hillcrest Memorial Hospital, in Silver City, with a serious illness. Before he entered the hospital, he allegedly directed that a handwritten will be prepared by Emma Mills, his first cousin. The handwritten document provided in its entirety:

October 28–1980

To Emma Mills—

This property in Glenwood N. Mex
 My home place & water rights
 My cattle & permit
 My car & pickup & horse trailer & horse
 also 28 acres on Grandma Kelley ranch
 also tractor & plows.

To my brother Kelley Kelley 15 acres
 I own on John Kelley Ranch

To my sister Emma Roberts $500

" " " Nina Tipton $500

" "Brother Esias Kelley $500

To my nephew Kenneth Kelley all savings I have in his & my name he also has a big sum in Albuquerque.

To Wayne Pierce
 My saddle & spurs & a tip.

To Floyd Higgins his mother's picture.

 Pat H. Kelly

David J. Ramos (Judge)

David Ramos Jr.

In late November, during the final stages of decedent's hospitalization, Emma Mills requested two strangers who were visiting another patient in the hospital to witness the purported handwritten will of decedent. The two, David J. Ramos, Sr., and David J. Ramos, Jr., were father and son, and each signed the document as witnesses. Decedent did not personally sign the document; his signature was written thereon by Emma Mills, decedent's first cousin, purportedly at his request and direction. David Ramos, Sr., was a municipal judge in Hurley; at the time of the signing of the purported

will, his son was thirteen years old. Approximately two weeks thereafter, decedent died on December 12, 1980, while still hospitalized.

Decedent's nephew, Kenneth Kelly, filed a petition seeking to have decedent's will dated October 18, 1974, admitted to probate, a motion seeking to have the purported handwritten will of decedent declared invalid, and a motion seeking summary judgment.

. At the hearing on summary judgment, all parties conceded that decedent had not personally signed the document dated October 28, 1980, and that Emma Mills had in fact signed the decedent's name thereon. It was also undisputed that Mills read the instrument out loud to decedent in the presence of both witnesses and that the signatures of both witnesses to the handwritten document proffered by appellant were in fact genuine. It was disputed as to whether the decedent normally spelled his name "Kelly" or "Kelley", and as to whether the purported will was properly executed and witnessed and legally sufficient to constitute a testamentary disposition.

*Was Summary Judgment Proper?*

(A) *Execution and Witnessing of the Instrument*

On the motion for summary judgment, the parties tendered for the court's consideration the deposition testimony of Emma Mills, David Ramos, Sr., and David J. Ramos, Jr. Emma Mills stated in her deposition that she had signed the signature of Pat H. Kelley in the presence of the two witnesses and that the decedent had told her to sign the document on his behalf. She also testified:

Q. Did Pat Kelley ask David Ramos, the judge, to witness that will?

A. ... I told Pat, Well, you need to sign it before these witnesses. And he said, I can't sign that. He said, You sign it. And I said, Pat, I can't sign it. And he said, You can. He said, You know you can sign anything I've got. And I still didn't sign it. And Ramos [Sr.] said, Go ahead

and sign it. I heard him tell you twice to sign it so, he said, you go ahead and sign it. So then I signed it.

Q. Was Ramos' son there when that happened?

A. They were both right there standing just inside the door and almost at the head of Pat's bed.

In his deposition, David Ramos, Sr., testified that Emma Mills requested that he and his son go inside decedent's hospital room and act as witnesses. He stated that he did not remember whether decedent signed in his presence or whether the "Kelley" signature by Mills was on the document when he signed. He further testified:

Q. Could you describe for us in particularity what you saw and what you observed?

. . . .

A. Well, if I remember correctly, this woman asked the gentleman that was in the bed, that I was going to go ahead and witness his signature. And then if I recall right, I think she read the document that she had in her hand.

Q. Did you see the document?

A. Yes, I read it myself before I signed it.

. . . .

Q. You told us then that Mrs. Mills read this document to the gentleman?

A. Right.

. . . .

Q. Could you describe for us his condition or generally what you observed about him?

A. Well, as far as I can remember, he was of sound mind and he knew what he was doing, really. That's as far as I can remember.

Q. What did you see or observe that leads you to that conclusion, Mr. Ramos?

A. The way he was talking, the way he was answering the questions that he was asked.

Q. What did he talk about or what questions was he asked that he responded to?

A. Let's see. One of them was about the document, if this was what he wanted to be signed. And if I remember correctly, he said yes, or I wouldn't have signed this.

Q. What happened next, then; did he sign this document?

A. I don't know what—I don't remember. I don't remember if he signed it in front of me, that's one thing I can't be sure of so I won't say one way or another.

Q. Was there anyone else in the room besides yourself and Mrs. Mills and your son?

A. No, not that I can remember, no.

The deposition testimony of the other witness, David Ramos, Jr., indicated that Mills read the instrument to him before he signed it as a witness. He stated that he and his father walked into decedent's room at the request of Emma Mills, that he read the document, and that he and his father affixed their signatures to it. He had no independent recollection of seeing the document before the court hearing, though he did recognize his signature on it. The testimony of Ramos, Jr. is contradictory as to whether he signed the document as a witness in the hospital room or in the hallway.

■ The trial court granted the motion for summary judgment of Kenneth Kelly and adopted findings of fact and conclusions of law determining that the purported will of the decedent, dated October 28, 1980, and executed in late November, 1980, was invalid because it was not properly witnessed or executed. In summary judgment proceedings, the trial court is not required to adopt findings of fact and conclusions of law. *Skarda v. Skarda,* 87 N.M. 497, 536 P.2d 257 (Ct.App.1975). Where the testimony of a single witness is conflicting as to a material fact, summary judgment is improper and the question is for the jury. *Rodriguez v. State,* 86 N.M. 535, 525 P.2d 895 (Ct.App.1974); *Kelly v. Montoya,* 81 N.M. 591, 470 P.2d 563 (Ct.App.1970).

Among others, the trial court adopted the following findings incident to his order granting summary judgment:

[2] During November, 1980, a woman stopped David J. Ramos, Sr. and his son David J. Ramos, Jr. in Hillcrest Memorial Hospital asking them to witness a signature on a document.

[3] David J. Ramos, Sr. does not remember whether or not Pat H. Kelly was asked to sign the will.

[4] The will was not signed by Pat H. Kelly or by Emma K. Mills at Pat H. Kelly's direction in the presence of David J. Ramos, Sr. or of David J. Ramos, Jr.

. . . .

[10] David [sic] J. Ramos, Jr. does not remember whether or not the will proposed by Emma K. Mills was the document that Emma K. Mills handed him at the hospital for his signature.

[11] hospital room at the time the will was executed by him.

[12] David Ramos, Jr. and his father were outside of Pat H. Kelly's hospital room and were in the hallway at the time the will was signed by them.

[13] The will was not witnessed in the presence of Pat H. Kelly.

In the conclusions of law adopted by the trial court, he determined that "the will was not signed by Pat H. Kelly or by Emma Mills at Pat H. Kelly's direction in the presence of David J. Ramos, Sr. or David J. Ramos, Jr." The court also concluded that "[t]he will proposed by Emma K. Mills does not satisfy the requirements of NMSA 1978 § 45–2–502."

Section 45–2–502, N.M.S.A.1978, provides in applicable part:

Except for writings within Section 2–513 [45–2–513 NMSA 1978] and wills within Section 2–506 [45–2–506 NMSA 1978]:

A. every will shall be in writing, signed by the testator or in the testator's

name by some other person in the testator's presence and by his direction, and attested in the presence of the testator by two or more credible witnesses; and

B. the witnesses to a will must be present, see the testator sign the will, *or one sign it for him at his request as and for his last will and testament,* and must sign as witnesses in his presence and in the presence of each other. [Emphasis added.]

In adopting the Uniform Probate Code, our Legislature did not incorporate the U.P.C. provisions relating to execution of wills. Instead, § 45–2–502 is based upon the language of former New Mexico Sections 30–1–4 and 30–1–6, N.M.S.A.1953. *See generally* W.G. Flickinger, *Intestate Succession and Wills Law: The New Probate Code,* 6 N.M.L.Rev. 25, 35 (1975).

Section 45–2–502, *supra,* as articulated by the legislature, imposes stricter requirements for the execution of wills than those provided in the proposed model draft of the Uniform Probate Code. Under the provision of the model Uniform Probate Code, the procedures for executing and attesting wills were substantially modified and simplified. As set forth in the commentary to § 2–502, Uniform Probate Code, "The intent is to validate wills that meet the minimum formalities of the statute." In rejecting the suggested language of the U.P.C. and retaining the language of our prior statutes relating to the requirements for execution and attestation of wills, New Mexico requires greater formality for the signing and witnessing of wills.

 Even in New Mexico, however, a formal attestation clause is not a requirement of a valid will under § 45–2–502, *supra;* a will may be valid even though it has no attestation clause. *In re Akin's Estate,* 41 N.M. 566, 72 P.2d 21 (1937). In the absence of an attestation clause, a presumption of due execution attaches where the document has been signed and witnessed "if the subscribing witnesses are dead or cannot recall with certainty any of the details of the transaction." *Id.* Once, however, presumption of due execution is met or

rebutted, it disappears. *Matter of Estate of Padilla,* 97 N.M. 508, 641 P.2d 539 (Ct. App.1982); N.M.R.Evid. 301, N.M.S.A.1978 (1982 Cum.Supp.); *see generally* R. Gonzales, *Survey of New Mexico Law, 1979–1980: Evidence,* 11 N.M.L.Rev. 159, 162–3 (1980–81). If there is no attestation clause, the facts of the execution may be shown by other evidence. *In Re McGary's Estate,* 127 Colo. 495, 258 P.2d 770 (1953).

Tracing the history of § 45–2–502(B), *supra,* it is apparent that the wording of the statute is substantially unchanged from the language adopted by Laws 1889, Chapter 90, Section 2 (§ 30–1–6, *supra* ). As observed in *In re Akin's Estate, supra,* the California statutes regarding the manner of executing wills are substantially the same as those of New Mexico.

Appellant argues that § 45–2–502, *supra,* does not impose a requirement of "publication" or declaration by the testator to the witnesses that the purported will signed on his behalf was his last will and testament. The California statute does contain the requirement of "publication" by the testator. Cal.Probate Code § 50 (West 1956). Similarly, in New Mexico, when a testator directs that an individual sign a will for him on his behalf, § 45–2–502(B) requires publication or some manifestation by the testator that the instrument is being signed "at his request as and for his last will and testament."

 As stated in G. Thompson, *The Law of Wills,* § 133 (3d Ed.1947):

Publication, as the term is used in the law of wills, is the declaration or act of the testator, at the time of signing or acknowledging his signature, manifesting his intention to adopt the instrument as his will; and any communication indicating to witnesses that the testator intends to give effect to a paper as his will by word, sign, motion, or conduct is sufficient in law to constitute a publication. [Footnote omitted].

 The requirement of publication necessitates that the testator indicate to the witnesses, at the time of their subscribing,

that the instrument signed is his will. In order to satisfy this provision, however, no particular form of publication is required. There need not be an express spoken declaration, and it is sufficient that the testator by words or conduct signify to the witnesses in some manner that the instrument is his will. *In Re Silva's Estate,* 169 Cal. 116, 145 P. 1015 (1915); *see generally* Annot., 71 A.L.R.3d 877 (1976); Annot., 60 A.L.R.2d 124 (1958); *In Re Gray's Estate,* 89 Cal. App.2d 478, 201 P.2d 392 (1948); *In Re Norswing's Estate,* 47 Cal.App.2d 730, 118 P.2d 858 (1941). A declaration that the instrument to be witnessed is the will of testator may be made by one other than the testator if the testator indicates his agreement thereto. *Howard v. Smith's Estate,* 344 P.2d 260 (Okl.1959); *see In Re Holloway's Estate,* 195 Cal. 711, 235 P. 1012 (1925).

■ The proponent of a document purporting to constitute a will has the burden of establishing at trial proof of the execution of the instrument. Section 45–3–407, N.M.S.A.1978. Both of the attesting witnesses to the purported will testified in their depositions that Emma Mills read the instrument to decedent, evidencing that he knew its contents. The deposition testimony of David Ramos, Sr., expresses uncertainty as to whether the document was signed in his presence but did suggest that decedent indicated that he wanted the instrument to be signed. It is possible to draw an inference from this testimony that the witnesses signed the document inside the hospital· room and in the decedent's presence. A reasonable inference exists when a conclusion may be drawn from facts admitted or established by the evidence. *Bolt v. Davis,* 70 N.M. 449, 374 P.2d 648 (1962), *quoting Stambaugh v. Hayes,* 44 N.M. 443, 103 P.2d 640 (1940).

Each witness testified that he read the document before he signed it. The deposition of Emma Mills expressly stated that decedent directed her to sign the will and that Ramos, Sr., was present during this conversation. Mills also testified that the attesting witnesses were both present in the hospital room with decedent when she signed decedent's signature to the instrument and when the two witnesses signed the purported will. Although § 45–2–502, *supra,* retains the former statutory requirements that the execution of a will be done with the testator and witnesses all present at the same time, this language has been interpreted so as not to require the witnesses to see the other witness sign but merely that they be in the line of sight so that they could have seen one another sign had they looked. *McElhinney v. Kelly,* 67 N.M. 399, 356 P.2d 113 (1960); Flickinger, *The New Probate Code, supra.*

■ As shown by the above deposition testimony, genuine material issues of fact exist concerning whether the handwritten document proffered as decedent's will was properly executed and duly witnessed.

(B) *Issue of Testamentary Intent*

Appellee argues an alternative basis for upholding the trial court's order granting summary judgment—that the instrument purporting to constitute a will of decedent is void, since it fails to expressly set forth any language evidencing a testamentary intention by decedent. No express reference contained in the document indicates whether decedent intended the property referred to therein to pass immediately or only in the event of his death.

■ An essential requisite of every will is that at the time of execution the instrument must have been intended by the testator to effect a disposition or provision affecting his property at the time of his death. Section 45–2–502, *supra;* § 45–1–201(A)(45), N.M.S.A.1978. Revocability during a testator's lifetime, and an intent that the disposition take effect only after the death of the testator are essential hallmarks of a will. *See McDonald v. Polansky,* 48 N.M. 518, 153 P.2d 670 (1944).

As set out in Thompson, *Law of Wills, supra,* § 12 at 24:

In order that an instrument be entitled to probate as a will it must be testamentary in character, and whether it is testamen-

tary in character depends upon the intention of the maker. The animus testandi gives the instrument its testamentary character, and when this is established it is a will if the requirements as to form and execution have been complied with. Where there is no testamentary intent there can be no will. [Footnotes omitted.]

■ The burden is upon the proponent of a document purported to be a will, to prove that the instrument was executed by the decedent with the intention that the instrument should constitute his last will and testament. *See* § 45–3–407, N.M.S.A. 1978.

■ To be a valid will, it is not essential that the document expressly recite that the instrument shall take effect only at the death of the testator, if the instrument and circumstances under which it was written reasonably indicate that the document was intended to be testamentary in character. *McDonald v. Petty,* 262 Ark. 517, 559 S.W.2d 1 (1977); *In Re Gutierrez' Estate,* 189 Cal.App.2d 165, 11 Cal.Rptr. 51 (1961); *In Re Beebee's Estate,* 118 Cal.App.2d 851, 258 P.2d 1101 (1953). Where a dispute exists as to the meaning of a provision in a will, the intention of the testator as expressed in his will controls the legal effect of his dispositions. Section 45–2–603, N.M. S.A.1978.

■ Extrinsic evidence is generally admissible to establish testamentary intent as to an instrument which on its face is ambiguous as to whether the decedent intended it to serve as a testamentary document. *In Re Sargavak's Estate,* 35 Cal.2d 93, 216 P.2d 850, 21 A.L.R.2d 307 (1950); *In Re Golder's Estate,* 31 Cal.2d 848, 193 P.2d 465 (1948); *In Re Spies' Estate,* 86 Cal.App.2d 87, 194 P.2d 83 (1948); *In Re Estate of Moore,* 443 Pa. 477, 277 A.2d 825 (1971); *In Re Kauffman's Estate,* 365 Pa. 555, 76 A.2d 414 (1950); *In Re Gray's Estate,* 365 Pa. 411, 76 A.2d 169 (1950).

W. Bowe and D. Parker, *Page on the Law of Wills,* § 5.16, (1960) at 204, observes that "[i]f the instrument is ambiguous on its face, and might or might not be a will, as far as its language is concerned, extrinsic evidence of the intention of the maker is admissible, to show whether such instrument is a will or not. (Footnote omitted.)" As set out in Annot., 21 A.L.R.2d 319 (1952). Admissibility of extrinsic evidence upon issue of testamentary intent, at 324:

There seems to be little doubt that where a paper, on its face, might reasonably be construed as either a testamentary disposition or some other type of instrument, extrinsic evidence bearing upon the maker's intention as to how it should operate is admissible for the purpose of clearing up the ambiguity.

■ New Mexico follows the general rule that where ambiguity appears in an instrument, extrinsic evidence is generally admissible to show the intent of the maker. *Moore v. Bean,* 82 N.M. 189, 477 P.2d 823 (1970); *Lamphear v. Alch,* 58 N.M. 796, 277 P.2d 299 (1954); *In re Roeder's Estate,* 44 N.M. 429, 103 P.2d 631 (1940); *Matter of Estate of Shadden,* 93 N.M. 274, 599 P.2d 1071 (Ct.App.), *cert. denied,* 93 N.M. 172, 598 P.2d 215 (1979); *see Matter of Estate of Padilla, supra; see also Matter of Estate of Martin,* 97 N.M. 773, 643 P.2d 859 (Ct.App. 1981), *overruled on other grounds sub nom. New Mexico Boys Ranch, Inc. v. Hanvey,* 97 N.M. 771, 643 P.2d 857 (1982).

■ The intent of the testator is the primary consideration and that intent must prevail if it is consistent with the law. *New Mexico Boys Ranch, Inc. v. Hanvey, supra.* In a case involving an alleged alteration of a will, the court stated in *In Re Roeder's Estate, supra;* "whenever the issue is whether the testator signed a particular will which is offered for probate, the pre-existing testamentary design is relevant and may be shown in evidence."

■ Where a doubt exists as to whether an instrument was intended to be a will, the issue of testamentary intent is generally a question of fact for the trier of fact. *Matter of Estate of Webber,* 97 Idaho 703, 551 P.2d 1339 (1976).

■ Under the facts herein a material disputed fact existed as to whether the

decedent intended the instrument proffered by appellant to constitute his will. Under these circumstances, appellant was entitled to have this issue determined by the jury as fact finder.

*First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.), *cert. denied sub nom. N.M. Mill & Elevator Co. v. First Nat. Bank in Albuquerque,* 88 N.M. 29, 536 P.2d 1085 (1975), sets out the general rules applicable to summary judgment:

> (1) A summary judgment proceeding is not to decide an issue of fact, but, rather, to determine whether one exists.
> (2) Summary judgment can be granted only where the record shows there is no genuine issue as to any material fact.
> (3) The party opposing the motion for summary judgment must be given the benefit of all reasonable doubts in determining whether an issue of fact exists.
> (4) Summary judgment can be granted only where the moving party is entitled to the judgment as a matter of law, upon clear and undisputed facts.
> (5) Summary judgment proceedings must not be used as a substitute for trial.

Summary judgment, being an extreme remedy, must be utilized only with due caution and cannot be granted if a single issue of material fact exists in the case. *Jelso v. World Balloon Corp.,* 97 N.M. 164, 637 P.2d 846 (Ct.App.1981). Even where the facts are undisputed, if equally logical but conflicting inferences can be drawn from facts, summary judgment should be denied. *Fischer v. Mascarenas,* 93 N.M. 199, 598 P.2d 1159 (1979). If the evidence at the hearing on summary judgment is sufficient to create a reasonable doubt as to the existence of genuine issues of material fact, summary judgment is not proper. *Bowman v. Butler,* 98 N.M. 357, 648 P.2d 815 (Ct.App.1982).

The order of the trial court granting summary judgment is reversed and the cause remanded for trial on the merits.

IT IS SO ORDERED.

WALTERS, C.J., and WOOD, J., concur.