[Civ. No. 14508.   Second Dist., Div. Two.   July 12, 1944.]

LANE-WELLS COMPANY (a Corporation), Appellant, v. SCHLUMBERGER WELL SURVEYING CORPORATION (a Corporation), Respondent.

Raphael Dechter and B. L. Hoyt for Appellant.

Frank Karr, E. D. Yeomans, John P. Bullington and Randolph Karr for Respondent.

MOORE, P. J.—We have here for decision whether the findings of the court are supported by the evidence; i. e. whether the licensor complied with its agreement whereby it might fix the minimum net prices to be charged by the licensee in using certain patented methods for logging oil wells.

Respondent, as owner of patented "systems and methods" for electrical logging of oil wells, was at all times herein mentioned, and had been, engaged in doing electrical logging by use of its patented methods some years prior to the contract with appellant. By an unambiguous writing dated April 2, 1938, it granted to plaintiff a nonexclusive, nonassignable license to use such patented method, for which license plaintiff agreed to pay the royalties hereinafter mentioned. The con-

tract reserved to licensor the privilege of fixing the prices to be charged for the service by either party so "that neither party would have a price advantage over the other." The licensee was forbidden to make any arrangement or rebate designed to diminish the benefits of the licensor; it was required to keep accurate and faithful records to show in detail the business done by use of the methods, the gross price charged, the rate of discount allowed and all rebates that would tend to reduce the gross price, which records would enable licensor to determine that the accountings had been accurate and complete. The fixed minimum net price was not to be more than that charged by licensor. On or before the 20th of each calendar month licensee must mail to licensor an itemized statement containing the information required to be kept in its records of the work done during the preceding calendar month. As consideration for the license, licensee agreed to pay a royalty of 15 per cent of the gross price fixed by licensor from time to time, less discounts permitted by licensor, the minimum net price to be determined according to clause 8, as follows:

"8. The Licensor shall fix from time to time the minimum net price to be charged by the Licensee for the doing of the various classes of service, work and jobs in which any process or invention or improvement is used hereunder, in systems or methods for electrical logging, provided, however, that the minimum price so fixed shall not be more than the minimum price charged by the Licensor in the same oil field for the same type of service, work or job during the same period of time, and, after any such minimum price has been so fixed, the same shall continue in force until the Licensor shall give to the Licensee written notice of any change or changes therein, which notice must be given at least thirty days before the same is to become effective, whereafter such changed prices must be charged by the Licensee until and unless any further change is made by the Licensor. The Licensee and the Licensor agree not to reduce, directly or indirectly, by discount, rebate, gift, or concession, such minimum prices so long as the same shall remain in effect, except as shall be determined upon by the Licensor from time to time."

Shortly after the execution of the contract licensor issued and forwarded to licensee a price schedule showing the prices to be charged for electrical logging operations, and included

in the same writing a graduated scale of discounts based upon the dollar value and the total volume of business performed for any one customer in any number of fields. The discounts authorized were as follows: On an account for $2,500 or less, no discount; on the second $2,500, 5 per cent; on the second $5,000, 10 per cent; above $10,000, 20 per cent. Such discounts were to be applied to the gross prices named in the schedules, thereby deriving the minimum net prices to be charged. This discount is hereafter referred to as "volume discount." It is the basis of appellant's action, and concerning it a declaration of the court was sought. The second letter of July 30, 1938, contained a price list and advised appellant (1) that "we did not publish this volume discount on our price list," and (2) that, while in the April letter it had grouped companies having a common control, "each company is now considered a separate unit for computing volume discount." The full significance of the volume discount appears not to have been comprehended by appellant prior to its actual commencement of logging operations, which was about April, 1939. By its letter of that month respondent wrote appellant that "all prices are net, meaning payment therefor to be made in thirty days without discount."

In immediately subsequent correspondence appellant remonstrated that under respondent's system of granting volume discounts the contract would be violated in respect to that provision which authorizes the licensor to fix from time to time the *minimum net* price to be charged by licensee, demanded the fixing of "minimum net prices which shall apply to all fields" and urged that the volume discount when conceded to a customer operating in several states worked an insuperable hardship upon licensee, whose activities were originally confined to California and have continued in this state but it has not operated in all of the fields in which licensor has at all times transacted business. An additional hardship was that appellant was prevented from quoting a definite price to a customer, because if licensee should operate in many states such price could not be ascertained until all of the work performed for such customer in the United States could be ascertained and the volume discount computed. Licensee contended then, as it does now, that inasmuch as licensor transacted logging business in all of the oil fields in the United States for some operators while licensee did business in only

some of the oil fields in which licensor had been and still is doing business, the practice of giving volume discounts based upon work done by a customer in several fields in the oil bearing states operated to the price advantage of licensor in that it did not actually "fix" minimum net prices for the same field and for the same type of work and during the same period of time.

The trial court found that under the contract the licensor has fixed "the minimum net prices" to be charged by licensee; that it has notified licensee of all prices to be charged in all oil fields; that licensor has not reduced prices in any way below those forwarded to licensee, and decided that licensor may properly under the contract include as a part of the minimum net prices a provision for the discounts specified in the letters of licensor to licensee, and that they may be based on "the total volume of business done in the United States." We have to determine whether such findings and decision are sustained by the contract and by the acts of the parties.

The contract contains within its terms no ambiguity or uncertainty. Its construction therefore must be derived solely from the language within its borders and effect must be given to all parts of the writing. (6 Cal.Jur. 328, § 193; *Bank of America* v. *Schumacher,* 6 Cal.App.2d 651, 653 [45 P.2d 239]; *Scudder* v. *Perce,* 159 Cal. 429 [114 P. 571]; *Roesch* v. *De Mota,* █ (Cal. App.) 143 P.2d 67.] █ Under that principle the reviewing court is not bound by the decision of the trial court made either without the aid of evidence or where there is no conflict in the evidence. (*Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825].) █ Guided by these principles we now proceed to explore the language of the license agreement and to weigh the acts done thereunder.

A cursory glance at the writing discloses (1) that the parties purposed to avoid placing either of them at a price disadvantage in a competitive field; (2) that licensor's royalty of 15 per cent was to be based upon the gross prices less any allowed discount granted by licensee; (3) that either might grant rebates to its customers so long as they do not reduce the minimum net price; (4) that licensee's books shall truly

reflect the gross prices and the discount or rebate allowed. The controversy involves only paragraph 8, *supra.* It provides that licensor shall wield the whip hand, in that *"from time to time"* it shall fix the *"minimum net price"* to be charged by licensee, provided, however, that the "minimum price" *so fixed* shall not be more than the "minimum price" charged by the licensor in the same oil field for the same type of service; and after *such minimum price* has been *so fixed* the same shall continue in force until the licensor gives licensee written notice of change. The parties agree not to reduce by discount or rebate *such minimum prices.*

From the foregoing abridgement of paragraph 8 and the italicized phrases it appears to have been definitely intended by the parties that the licensor shall fix the *minimum net price.* It is equally clear that the phrase "minimum price so fixed" could mean nothing else than the "minimum net prices" *fixed* at first by the licensor. Otherwise the phrase "so fixed" would be meaningless, for there was nothing "so fixed" except the "minimum net price." From this the conclusion is irresistible that the authors of the contract had no intention other than to use the two phrases interchangeably. When they agreed therefore that the *minimum price* shall not be more than the minimum price charged by licensor in the same oil field for the same type of service, they meant *minimum net* prices and not gross prices. We find nothing in the phraseology to warrant the court's finding that "defendant has not failed to fix such minimum net price," or to justify the contention of respondent that "the *minimum prices* can be reduced by discount as determined by licensor from time to time," or that "the minimum prices are the prices before the application of the discount and minimum net prices are the prices after the application of the discount."

If the licensor might "fix the minimum net price to be charged by the licensee" as well as by itself, then no other discount or rebate could be deducted by either party from such net price without violating the contract. But this is exactly what the licensor did by granting volume discounts to patrons who engage in drilling oil wells in the several oil bearing states. Take for illustration the case of the Texas Company. Licensor's bill for logging charges for the month of March, 1942, were $13,083.57, the aggregate of all charges

against it in six different states. After subtracting $2,500 on which no deduction is allowed there remained $10,583.57. By making the deductions of 5 per cent on the second $2,500, 10 per cent on the next $5,000 and 20 per cent on the next $3,083.57, that customer of licensor received a total discount on its bill for $13,083.57 in the sum of $1,241.70. This meant a discount on respondent's California contracts of almost 10 per cent, a far greater rate of discount than is possible for appellant to give to its California contractees. In all its operations respondent rendered the same service as that which was rendered by appellant, charged the same prices and thereafter remitted to its customers the rebate based upon the aggregate of business done for any such customer in all the fields of the customer's activities.

Such practice violates that provision of the contract which forbids either to reduce the minimum net prices fixed by licensor. Since appellant is not engaged in logging in all states where oil is developed it cannot grant a discount based upon work in eastern fields and therefore must charge its California customer a greater price than that which respondent may, under the volume discount practice, accept in final settlement of its charges. This gives respondent a distinct price advantage in the very fields in which appellant is a business rival, although it pays a royalty to respondent on all work done. If, however, the discounts provided for in the contract be applied to each field separately, no advantage over appellant would obtain. Each would be able to quote the "minimum net price" with assurance that the other would not underbid him or pay a rebate upon the charges made based on the price schedule. But even though appellant were rendering the logging service in seven states, the practice of granting volume discounts based upon the aggregate of work done for one customer in all the oil fields would make it impossible to quote definite prices to its patrons. This is so because the rebate is made up after the reports are received from all of the different states. Under the contract licensee must on the 20th day of each calendar month forward to licensor a statement of all persons served, with the names and numbers and locations of each well, the work done and the *rate of discount* allowed which may have the effect of reducing the gross price. If the discounts be applied to the accounts for each field separately, both would then operate upon the

same basis with respect to prices. Under such a license contract as that here involved it could not have been intended that a licensee of a patented process for the manufacture of rubber goods, operating only in California in competition with the licensor who sells the product in all forty-eight states, would be forced to base its discounts upon the sales made in this state while the licensor may grant rebates based upon the volume of sales made in all of North America.

If equality of opportunity is the key word of the contract the ascertainment of such purpose is paramount. (*In re City and County of San Francisco*, 191 Cal. 172, 177 [215 P. 549]; *Bradley Co.* v. *Mulcrevy*, 166 Cal. 325 [136 P. 60].) In achieving that end such construction is to be preferred as makes a contract reasonable, fair and equitable to both parties. (*Whitney* v. *Aronson*, 21 Cal.App. 9 [130 P. 700]; 17 C.J.S. 739, § 319; *Southern Surety Co.* v. *Bank of Lassen*, 118 Cal.App. 149, 154 [4 P.2d 952].) Since respondent has not fixed minimum net prices but has merely furnished appellant with a schedule of prices which must be followed by appellant but below which respondent may go by virtue of its application of the volume discount to the aggregate of the accounts of a patron in any number of fields, the findings that respondent "at all times has fixed such *minimum net prices*" and "that it is not true that defendant has failed or refused at any time to fix the minimum net prices to be charged by plaintiff and defendant . . ." are not supported by the evidence.

The judgment is reversed.

McComb, J., concurred.

A petition for a rehearing was denied July 31, 1944, and respondent's petition for a hearing by the Supreme Court was denied September 1, 1944. Shenk, J., and Carter, J., voted for a hearing.