[Civ. No. 24737. First Dist., Div. One. Oct. 28, 1968.]

HOWARD RUTH, JR., et al., Plaintiffs and Appellants, v. LYTTON SAVINGS & LOAN ASSOCIATION OF NORTHERN CALIFORNIA et al., Defendants and Respondents.

Roger L. Mosher, Theodore C. Carlstrom, McCloskey, Wilson, Mosher & Martin, Wilson, Mosher & Martin and William I. Cohen for Plaintiffs and Appellants.

Edmund L. Regalia, Miller, Starr & Regalia, John J. Hopkins, Carr, McClellan, Ingersoll, Thompson & Horn, Luther M. Carr and Quentin L. Cook for Defendants and Respondents.

ELKINGTON, J.—Plaintiffs Howard and Martha Ruth lost their interest in certain real property upon foreclosure of trust deeds held by defendant Lytton Savings and Loan Association (herein called "Lytton"). Seeking declaratory and other relief from Lytton, Transamerica Title Insurance Company, successor to City Title Insurance Company (herein called "City Title"), Seabreeze Construction Company, Inc. (herein called "Seabreeze"), Lytton Financial Corporation (trustee of Lytton's trust deed) and Jeremy Ets-Hokin, doing business as Riviera Properties (herein called "Ets-Hokin"), they commenced this action. As to City Title they sought damages for breach of trust, breach of contract and negligence "to the extent that any remedy against the other defendants is inadequate to fully compensate plaintiffs for damages sustained," and for attorney fees. As to the remaining defendants plaintiffs sought relief under various "alternative" theories of action. The trial was to the court. From a judgment in favor of all defendants except Seabreeze,[1] plaintiffs appeal.

The following facts were uncontroverted at the trial.

Plaintiffs were the equitable owners of two unimproved lots of land held in the name of City Title, subject to plaintiffs' order. They entered into an agreement with defendant Seabreeze to sell the land for $158,000. The terms were $40.000 down with the balance of $118.000 to be secured by first trust deeds for $59,000 on each of the two lots. Plaintiffs agreed to subordinate this trust deed security to trust deeds securing "construction and/or take out loan[s]"[2] at an interest rate not to exceed 7.2 percent per annum and in amounts limited to 66⅔ percent of the lender's appraisal of the total value of the land and improvements to be constructed.

Thereafter Seabreeze negotiated with Lytton for the needed loans. Lytton agreed to make two loans of $310,000 each at an interest rate of 6¾ percent *plus 2 percent additional interest in case of default*. Each of the loans would be for *68.8* percent of Lytton's appraisal of the land and projected improvements. From the loan funds Lytton was to make a "land advance" of $46,400.

Seabreeze thereupon delivered a set of building plans to plaintiffs. By letter it requested and obtained their approval of the plans and of loans in the amount of $620,000 for 22

---

[1]The judgment is silent as to Seabreeze, probably because plaintiffs' claim against that defendant rested upon "purchase money" trust deeds and was therefore unenforceable. (See Code Civ. Proc., § 580d.)

[2]A "take out" loan is a loan designed to pay off an earlier loan.

years at 6¾ percent interest for "financing for the construction of the projects." Soon thereafter plaintiffs deposited in escrow with City Title copies of their agreement and the letter of Seabreeze describing the contemplated loans as "financing for the construction of the projects." These papers constituted, and were accepted by City Title as, plaintiffs' escrow instructions. They also provided for the issuance by City Title, at the close of the escrow, of a title insurance policy in favor of Seabreeze and plaintiffs guaranteeing that title to the property stood in Seabreeze subject to plaintiffs' above mentioned trust deeds. Plaintiffs agreed to pay the title insurance premium.

Thereafter Seabreeze submitted its buyer's escrow instructions to City Title, which thereupon prepared the trust deeds to be taken by plaintiffs as security. These trust deeds contained the subordination provisions of plaintiffs' contract with Seabreeze. Lytton then submitted its escrow instructions, which expressly prohibited subordination of any existing lien and also prohibited secondary financing. Faced with this conflict City Title contacted Lytton, asking if it would permit "secondary financing consisting of two loans, each in the amount of $59,000, and each payable $400 monthly, 7 percent interest." Lytton amended its instructions to allow such secondary financing.

City Title thereupon telephoned plaintiff, Howard Ruth, Jr. He was told that "everything was all in and signed, and the only thing they needed me to do was come down and sign the necessary document for their authorization to disburse the funds, and for me to go over the figures and to bring my checkbook, and the deed and notes and everything were all drawn and signed by all the parties."

Mr. Ruth went to the office of City Title and as requested signed the "necessary document." The paper was entitled "Seller's Instructions." It contained many recitals, some printed, some handwritten and some both. Several items were inserted by interlineation; others, both printed and handwritten, were crossed out in ink. At issue at the trial (and here) is a partly printed and partly handwritten line reading "By Second Trust Deed [~~Existing or~~ New] 59,000 & 59,000-118,000." Ruth, as indicated, was told that the paper was a "necessary document for their authorization to disburse the funds." No other explanation of the document or any of its entries was asked for or given.[3]

---

[3]Plaintiffs' explanation of the "Seller's Instructions" incident was undenied by City Title at the trial.

City Title thereupon caused the escrow to be closed, recording plaintiffs' trust deeds as second and inferior to those of Lytton. Lytton's trust deeds as recorded, and as agreed with Seabreeze, secured loans of $620,000, with interest at 6¾ percent plus 2 percent additional interest in case of default. The loans included the "land advance" of $46,400. City Title was of course a paid escrow holder.

City Title then disbursed the loan funds deposited by Lytton. From these funds plaintiffs were paid, less certain deductions, Seabreeze's promised down payment of $40,000. Seabreeze was paid $6,400, the balance of the "land advance." "Good faith" deposit checks of Seabreeze totaling $2,000 which had been deposited in the escrow were returned to Seabreeze uncashed. City Title thereupon issued to Seabreeze and plaintiffs the previously requested title insurance policy. However, the policy guaranteed title to be in Seabreeze, subject to Lytton's *first* trust deeds and plaintiffs' *second* trust deeds. The premium, $501, was deducted from cash which would otherwise have been payable to plaintiffs under the escrow. The amount of the policy was $158,000.

Plaintiffs testified that it was not until some time later that they learned that their security consisted of second trust deeds and that Seabreeze's $40,000 down payment was made from the Lytton loans. They also testified to a lack of knowledge until after the close of the escrow that Lytton's interest charge was 2 percent additional in case of default, and that the ratio of the loans to Lytton's appraised value (68.8%) was in excess of that called for by their instructions to City Title. There was no evidence to the contrary.

Several months after completion of the escrow Seabreeze defaulted on its obligations to plaintiffs and Lytton. Plaintiffs commenced foreclosure proceedings in which a trustee sale was held, themselves purchasing the property. Thereafter Lytton conducted foreclosure proceedings on its superior trust deeds. In these proceedings the property was sold to Lytton for the claimed amount of its advances, $571,208. Two months later Lytton sold the property to defendants Ets-Hokin.

The trial court found that "Lytton Savings was a bona fide encumbrancer for value of the subject property, without actual or constructive notice of plaintiffs' rights under the [agreement with Seabreeze] or deeds of trust of which plaintiffs were beneficiaries." This finding, we conclude, was based on substantial evidence.

In its judgment the court, among other things, quieted title to the property in question in Lytton (and its transferee, Ets-Hokin).

Plaintiffs contend that since City Title did not comply with their instructions it was not authorized to pass title to Seabreeze. It follows as a matter of law, we are told, that Seabreeze took no title and was therefore unable to create a lien in Lytton's favor. Accordingly, it is urged, since Lytton's (and Ets-Hokin's) claimed title was derived from the ineffective trust deeds, the judgment quieting title was error.

Although the point was strongly urged by them at the trial, plaintiffs here overlook the fact that City Title held title to the lots in question *as trustee* for their benefit and subject to their order.

It is established law that a trustee, although it be in violation of the trust, may nevertheless transfer good title to a bona fide purchaser or encumbrancer in good faith for a valuable consideration. Civil Code section 2243 states: ''Everyone to whom property is transferred in violation of a trust, holds the same as an involuntary trustee under such trust, *unless he purchased it in good faith, and for a valuable consideration.*'' (Italics added.) An encumbrancer comes within the rule relating to purchasers in good faith for value. (*Schut* v. *Doyle,* 168 Cal.App.2d 698, 701 [336 P.2d 567]; 33 Cal.Jur. 2d, § 317, p. 704.)

In *Firato* v. *Tuttle,* 48 Cal.2d 136, 139 [308 P.2d 333], the court stated: ''The rule indicated by [Civil Code] section 2243, which would protect innocent purchasers for value who take without any notice that the conveyance by the trustee was unauthorized, is in accord with the rule protecting such purchasers who acquire their interests from one who holds a general power and who makes a conveyance for an unauthorized purpose [citation] or from a trustee under a secret trust. [Citations.] The protection of such purchasers is consistent 'with the purpose of the registry laws, with the settled principles of equity, and with the convenient transaction of business.' [Citation.] It also finds support in the better reasoned cases from other jurisdictions which have dealt with similar problems upon general equitable principles and in the absence of statutory provisions. [Citations.]''

The trial court did not err in quieting title to the subject property in Lytton and its transferee.

Plaintiffs also contend that Lytton, with notice of their trust deeds, made certain optional advances to Seabreeze and

others which were not subject to the lien of Lytton's trust deeds. In view of our conclusion as to plaintiff's "alternative" cause of action against City Title, a resolution of this point is unnecessary to a determination of plaintiffs' appeal.[4]

We shall now discuss the court's findings as they relate to plaintiffs' claim against City Title.

The trial court found:

"On or about August 17, 1962, plaintiff Howard Ruth, Jr. entered into two deposit receipt agreements with defendant Seabreeze relating to the sale of said real property. Said agreements provided for a total purchase price of $158,000.00, for the two lots, payable by Seabreeze as follows: (A) a down payment of $40,000.00 on or before close of escrow and [a] conveyance of the property from seller to buyer; and (B) the balance in the form of two purchase money deeds of trust for a total of $118,000.00. Each said deed of trust was to be a first lien, one on each lot, with a subordination provision as follows: However, seller agrees to subordinate said Deed of Trust to a Deed of Trust to be placed against the property by the buyer for a construction and/or take out loan. Said loan shall be for a period of no less than 15 nor more than 24 years and same shall not bear interest of more than 7.2% per annum. The amount of said loan shall be limited to a sum no greater than 66⅔% of the total value of both land and buildings securing same according to the appraisal of the lending institution. . . .

"City Title was aware of the terms and conditions of the agreement between plaintiffs and Seabreeze as contained in the deposit receipt agreements and other documents deposited in escrow by plaintiffs.

"Plaintiffs' escrow instructions relating to their lien priority are contained in the deposit receipt agreements between plaintiffs and Seabreeze which were accepted into escrow by City Title as escrow instructions.

"In closing the escrow, City Title made transfers of funds from Lytton to Seabreeze, . . . for non-construction purposes, knowing these funds were loan funds from the loan from Lytton Savings to Seabreeze.

"Prior to the close of escrow, City Title did not advise plaintiffs that pursuant to the escrow instructions of Seabreeze and Lytton Savings, loan funds were to be transferred

---

[4]City Title had insured Lytton's loan and trust deeds and Ets-Hokin's title and thus would appear to have an ultimate liability as to any judgment against these defendants.

from Lytton Savings to plaintiffs as the down payment for the purchase of the property, . . .

"Because of the violations of plaintiffs' instructions and breach of fiduciary duty by City Title, said defendant had no authority to deliver and record the deed to Seabreeze.

"City Title was negligent, breached plaintiffs' escrow instructions and its fiduciary duty to plaintiffs by causing the deeds of trust in favor of Lytton Savings to be recorded prior to the deeds of trust in favor of plaintiffs.

"Prior to the close of escrow, City Title did not advise plaintiffs that they were receiving second deeds of trust instead of first deeds of trust to be subordinated, nor did it advise plaintiffs that Lytton Savings' escrow instructions prohibited subordination. *In so failing to advise plaintiffs, City Title was negligent, breached plaintiffs' escrow instructions and breached its fiduciary duty to plaintiffs. . . .*" (Italics added.)

"It is not true that plaintiffs or either of them were negligent, careless or reckless, or were guilty of negligence or contributory negligence in connection with the transaction herein."

The foregoing findings were supported by substantial evidence.[5]

However, the trial court made additional findings to the effect: "The plaintiffs suffered no damages by reason of any act or omission by . . . City Title. . . . [ ¶ ] Plaintiffs were not damaged because Lytton Savings' loans and the disbursements and deductions thereunder were not contrary to or in violation of the terms and conditions of the subordination agreement. *If the Lytton Savings' loans and the disbursements and deductions thereunder had been contrary to or in violation of the terms and conditions of the subordination agreement, then City Title's negligence, breach of plaintiffs' escrow instructions and breach of fiduciary duty to plaintiffs would have been the actual and proximate cause of damages and injuries to plaintiffs of which they complain herein.*" (Italics added.)

The court made no express findings on the evidence that Lytton's trust deeds called for 6¾ percent interest, plus 2 percent additional interest in case of default, and were in an

---

[5]City Title, among other things, urged against plaintiffs' estoppel, ratification and election of remedies. The trial court directly, or by implication, on what appears to be substantial evidence, found against City Title as to each of these contentions.

amount bearing a ratio of 68.8 percent to Lytton's appraisal. However, as to these matters there was no dispute, and findings were not required. (See *Berk* v. *Twentynine Palms Ranchos, Inc.*, 201 Cal.App.2d 625 [20 Cal.Rptr. 144].)

Plaintiffs contend that the court's findings that they suffered no damage by reason of any act or omission of City Title "because Lytton Savings' loans and the disbursements and deductions thereunder were not contrary to or in violation of the terms and conditions of the subordination agreement" was unsupported by the evidence and was error.

At this point it seems useful to discuss the responsibilities of an escrow holder, such as City Title in the matter before us.

*Spaziani* v. *Millar*, 215 Cal.App.2d 667, 682-683 [30 Cal. Rptr. 658], states: "An escrow holder is the agent of all the parties to the escrow at all times prior to performance of the conditions of the escrow [citations]; bears a fiduciary relationship to each of them [citation]; and owes an obligation to each measured by an application of the ordinary principles of agency. [Citation.] [ ¶ ] It is the duty of an escrow holder to comply strictly with the instructions of his principal [citations], and if he disposes of the property of his principal in violation of these instructions, or otherwise breaches that duty, he will be responsible for any loss occasioned thereby. [Citations.] Likewise, it is the duty of an escrow holder to exercise ordinary skill and diligence in his employment [citations], and if he acts negligently he is responsible for any loss occasioned thereby, subject to the rules ordinarily applicable in the premises [citations]."

*Irvine* v. *California Cotton Credit Corp.*, 18 Cal.App.2d 761, 763 [64 P.2d 782], holds: "The law is well settled that rights of priority under an agreement of subordination extend to and *are limited strictly by the express terms and conditions of the agreement.*" (Italics added.) (See also *Miller* v. *Citizens Sav. & Loan Assn.*, 248 Cal.App.2d 655, 663 [56 Cal. Rptr. 844].)

California Land Security and Development (Cont. Ed. Bar), page 134, states: "It is fundamental that, before a subsequent lien will achieve priority via automatic subordination, it must fall exactly within the terms of the agreement."

City Title had before it escrow instructions under which plaintiffs agreed to subordinate their trust deeds to "construction and/or take out loan[s]" bearing interest no greater than 7.2 percent in an amount not exceeding 66⅔

percent of the lender's appraisal. These instructions were not uncertain or ambiguous. Their meaning must be determined from the language used. (Civ. Code, § 1638; *Ede* v. *Ede*, 208 Cal.App.2d 718, 720-721 [25 Cal.Rptr. 576]; *Lane-Wells Co.* v. *Schlumberger etc. Corp.*, 65 Cal.App.2d 180, 184 [150 P.2d 251].) They obviously were designed to protect the security of plaintiffs' trust deeds in the event of default by Seabreeze or its successor in interest.

 A loan for a down payment on real property is most clearly not a "construction loan." This self-evident proposition received judicial confirmation in *Radunich* v. *Basso*, 235 Cal.App.2d 826, 834 [45 Cal.Rptr. 824], where the court said: "There is a great deal of difference between a loan to obtain money to be used to improve the land or for construction thereon, which improvement or construction would enhance the value of plaintiff's security, and a loan for money to pay the purchase down payment."

In *Miller* v. *Citizens Sav. & Loan Assn., supra,* 248 Cal. App.2d 655, plaintiff Miller held a trust deed securing a purchase money note for $95,000. By the trust deed's terms it was to be subordinated to certain future trust deeds on the property to be "made primarily for the purpose of constructing improvements" on the land described therein. The defendant savings and loan association thereafter loaned $349,500. Of this sum $323,158.70 was disbursed for purposes set forth in the subordination clause of Miller's trust deed. However, $26,341.30 was paid to the borrower which retained it "for its own purposes." (P. 659.) There, unlike the case before us, the lender was aware of the limitations of the subordination agreement. The court held that the payment to the borrower "was a loan not within the subordination agreement and, therefore, subject to and not prior to, [Miller's] trust deed and the $95,000 obligation which that trust deed secured." (P. 665.) The court stated: "While it may not be impossible that a vendor has agreed to subordinate his purchase money lien to a lien secured by the purchaser to be used for purposes entirely apart from the mutual enterprise, such an arrangement would be so unusual and so unlikely that we would require it to be spelled out with particularity. Typically the loan proceeds are to be used for purposes which will promote the mutual enterprise and which will either enhance the vendor's equity in case he must foreclose his lien, or will provide funds from which he will be paid. *A subordination agreement should be construed, unless it expressly provides*

*otherwise, as permitting the loan proceeds to be used only for such purposes."* (Italics added.) (P. 663.)

In *Pollock* v. *Tiano,* 253 Cal.App.2d 183 [61 Cal.Rptr. 235], the Court of Appeal found no error in the trial court's refusal to allow evidence concerning the interpretation and intended meaning of the words "construction loan(s)" as used in escrow instructions. The court stated: "We agree with plaintiffs that the court was wholly disinterested in any evidence explanatory of the meaning of the term 'construction loan.' In order to protect credulous and inexperienced sellers of property against trickery and fraud, the term when considered alone has to be given the meaning that *it is a loan of money to be used for construction of improvements on the property and incidental expenses."* (Italics added.) (P. 186.)

We hold that the term "construction loan" as used in the escrow instructions of the case before us does not include money advanced for a down payment on the purchase price of real property.

The interest provisions of Lytton's trust deeds were also substantially out of accord with the subordination agreement. At least one of the major purposes of that agreement's interest limitation (7.2%) was to assure an acceptable interest rate should plaintiffs or their assignees be required to take over the property on Seabreeze's default. Upon Seabreeze's default Lytton was permitted to, and it did, increase the interest rate to 8.75 percent, which was more than 20 percent higher than that permitted by the subordination agreement and plaintiffs' escrow instructions. This resulted, upon Seabreeze's default, in an unauthorized yearly increase of nearly $10,000.

California's appellate courts appear never to have considered the problem immediately before us. However, the following discussions are pertinent and persuasive.

"Before insuring the priority of the later lien, title companies must inquire of the lender as to the terms of the note secured by the security instrument that is to become a first lien under the terms of the subordination agreement. Often the discrepancy is slight and obscure. *If, for example, a note for a construction loan contains a provision that in the event of default the interest rate is increased, at the lender's option, to a rate exceeding the general rate specified in the agreement, insurance of the priority of the construction loan is not possible."* (Italics added.) (California Land Security

and Development (Cont. Ed. Bar), *supra,* p. 134.) "Conformity of the terms of the later 'subordinating' lien to the requirements of the subordination agreement is a condition to the waiver of priority, and unless the terms of the subordination agreement are satisfied the alteration of priorities does not occur. For example, *if the interest rate* or term of the new loan *exceeds the maximum limitation established by the subordination agreement, the seller's 'purchase money' deed of trust retains its senior priority.*" (Italics added; fns. omitted.) (13 U.C.L.A. L.Rev. at p. 1306.)

The *amount* of Lytton's agreed loan of $620,000 was also violative of the subordination agreement. The excess of the actual ratio of that loan to Lytton's appraisal of the improved property (68.84%) over that permitted (66.67%) resulted in a loan larger by $19,000 than permitted by the subordination agreement. This substantially increased the hazards which would be faced by plaintiffs upon Seabreeze's default.

We conclude that the court's findings that "The plaintiffs suffered no damages by reason of any act or omission by . . . City Title . . ." and that "Plaintiffs were not damaged because Lytton Savings' loans and the disbursements and deductions thereunder were not contrary to or in violation of the terms and conditions of the subordination agreement" were erroneous. The evidence shows, without conflict, that Lytton's loans and its recorded trust deeds *were* substantially contrary to the terms and conditions of the subordination agreement.

As previously indicated, the trial court found that "If the Lytton's Savings' loans and the disbursements and deductions thereunder had been contrary to or in violation of the terms and conditions of the subordination agreement, then City Title's negligence, breach of plaintiffs' escrow instructions and breach of fiduciary duty to plaintiffs would have been the actual and proximate cause of damages and injuries to plaintiffs of which they complain herein." It follows that judgment should have been entered in favor of plaintiffs and against City Title.

As has been demonstrated, on substantial evidence the trial court concluded that "City Title was negligent, breached plaintiff's escrow instructions and breached its fiduciary duty to plaintiff." Whether the resulting liability be treated as arising in contract or in tort the measure of damages is the amount which will compensate plaintiffs for all of the detri-

ment proximately resulting therefrom (Civ. Code, §§ 3300, 3333.)

Had City Title honored plaintiffs' escrow instructions by recording their trust deeds as first liens, plaintiffs would have received, in exchange for their property, $40,000 cash and trust deed security unquestionably worth $118,000. For the reasons we have outlined, their trust deeds would not, in law, have been subordinated to those of Lytton. On the other hand, and a more probable eventuality, if the transaction was aborted due to Lytton's unwillingness to meet the seller's escrow instructions, plaintiffs would have remained the owners of land shown to be worth $158,000 by uncontradicted testimony.[6] In either view the damage to plaintiffs proximately flowing from City Title's mishandling of the escrow was $158,000, less the $40,000 received from the escrow—$118,000.

City Title contends that as a matter of law the earlier mentioned "Seller's Instructions" with its recital "By Second Trust Deed [~~Existing or~~ New] 59,000 & 59,000—118,000" was "the written contract between City Title and Ruth, and either incorporated the previous alleged oral instructions, or constituted a novation."

It bears repeating here that City Title bore a fiduciary relationship to plaintiffs. (See *Spaziani* v. *Millar, supra,* 215 Cal. App.2d 667, 683.)

Substantial evidence supports the court's findings that City Title had instructions from Plaintiffs that they required *first trust deeds as their security.* These detailed instructions incorporated an agreement to subordinate plaintiffs' trust deeds to a *construction loan of a specified amount and with a designated maximum rate of interest.* Plaintiffs had never, in any way, indicated that they would accept anything less.

City Title then told plaintiffs that the deal was ready to close, and that all that was needed was their signatures to a document which would authorize the company to disburse the funds. By its terms the needed document had a quite different purpose and effect. It purported to authorize City Title to accept second trust deeds as plaintiffs' security. It permitted

[6]The only evidence of the land's value was the $158,000 price paid by Seabreeze. Such a sale of the identical land is admissible as proof of value. (*Los Angeles Flood etc. Dist.* v. *McNulty,* 59 Cal.2d 333, 337 [29 Cal.Rptr. 13, 379 P.2d 493]; *Bagdasarian* v. *Gragnon,* 31 Cal.2d 744, 755-758 [192 P.2d 935].) Evidence of such a sale has been held to be "of first importance" in proving value. (*People* v. *Vinson,* 99 Cal. App.2d 100, 102 [221 P.2d 161].)

these second trust deeds to be recorded subject to first trust deeds which could secure loans made for any purpose (including Seabreeze's down payment), and without limitation as to the size of the loans or rate of interest. Such an arrangement, we believe, no reasonable man would knowingly accept, particularly, where as here, the only security for such a purchase money obligation would be the second trust deeds. To say that plaintiffs manifested an intent to modify their prior instructions by novation when the "Seller's Instructions" form was prepared by City Title and represented as being in conformity with the prior instructions is completely contrary to the evidence. The trial court's finding that plaintiffs had no such intent was proper.

It should be pointed out that plaintiffs were under no obligation to exhaust every means of collection from the debtor Seabreeze before proceeding against City Title. As indicated, the claim against Seabreeze, being based on "purchase money" notes and trust deeds, by virtue of Code of Civil Procedure section 580d was unenforceable. Moreover, it has been held that where one loses real property security through the negligence of a title insurance company he is not required to exhaust his claim against the principal obligor before resorting to the liability of the company. (*Howe* v. *City Title Ins. Co.*, 255 Cal.App.2d 85, 87 [63 Cal.Rptr. 119]; *Stephans* v. *Herman*, 225 Cal.App.2d 671, 673 [37 Cal.Rptr. 746].)

It is suggested that the court should consider the probabilities as to whether plaintiffs could have preserved their security even if Lytton's loans had met the requirements of their subordination agreement. Whether Seabreeze would have defaulted if it had invested $40,000 of its own money in the deal, or whether plaintiffs could have preserved their rights as inferior lien holders if they had been unburdened by the unauthorized conditions of Lytton's loans, depends on rank speculation. ▮ "A judgment cannot be based on guesses or conjectures." *Reese* v. *Smith*, 9 Cal.2d 324 [328 70 P.2d 933].) To support a finding an inference must be reasonable, must be based on evidence, and cannot be the result of mere guess, surmise, or conjecture. (*Marshall* v. *Parkes*, 181 Cal. App.2d 650, 655 [5 Cal.Rptr. 657]; see also *Eramdjian* v. *Interstate Bakery Corp.*, 153 Cal.App.2d 590, 602 [315 P.2d 19].)

▮ There remains the question of attorney fees sought by plaintiffs, who rely on *Prentice* v. *North American Title Guar.*

*Corp.*, 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645].[7, 8] In *Prentice*, because of the negligence of a *paid escrow holder* (there and here a title insurance company), a vendor of land commenced an action against a third person. The court held that a natural and probable consequence of the escrow holder's negligence was to require the vendor to file the action. It was stated (p. 621) : ''When a paid escrow holder has, as in this case, negligently made it necessary for the vendor of land to file a quiet title action against a third person, attorney's fees incurred by the vendor in prosecuting such action are recoverable as an item of the vendor's damages in an action against the escrow holder.''

We recognize that in *Prentice* damages were allowed against the negligent escrow holder for attorney fees rendered in a successful quiet title action against a *third person*. Here the action was against the escrow holder *and* third persons. Although plaintiffs are successful only against City Title, it must be held, because of the complex and uncertain problems caused by that company's negligence that plaintiffs acted reasonably and foreseeably in suing all defendants in order to insure relief from the position in which they had been improperly placed. Here also a natural and probable consequence of the escrow holder's negligence was the commencement of plaintiffs' action.

Accordingly, we hold that where as here, a title insurance company acting as a paid escrow holder negligently and proximately causes a vendor reasonably to protect his interest by suing third parties *and* the escrow holder, such vendor is entitled to reasonable attorney fees therefor.

The judgment as to defendant Transamerica Title Insurance Company is reversed; the superior court will enter judgment in favor of plaintiffs and against such defendant for $118,000, for interest thereon, and for reasonable attorney

[7]City Title makes no argument in response to plaintiffs' demand for attorney fees.

[8]Although the point is not raised in the briefs, it is noted that plaintiffs applied, and paid, for a title insurance policy which was to guarantee plaintiffs' security as a *first* trust deed. Had such a policy been written plaintiffs would ordinarily have been entitled to ''full reimbursement for all losses, up to the face amount of the policy,'' sustained because of the title insurance company's negligence in causing another trust deed to take priority. (See *J. H. Trisdale, Inc.* v. *Shasta County Title Co.*, 146 Cal.App.2d 831, 835 [304 P.2d 832]; *Overholtzer* v. *Northern Counties Title Ins. Co.*, 116 Cal.App.2d 113, 122 [253 P.2d 116].)

fees. The judgment as to defendants Lytton Savings and Loan Association, Lytton Financial Corporation, and Jeremy M. Ets-Hokin and Judith Ets-Hokin, doing business under the fictitious name of Riviera Properties, is affirmed.

Molinari, P. J., and Sims, J., concurred.

A petition for a rehearing was denied November 21, 1968, and the petition of respondent Transamerica Title Insurance Co. for a hearing by the Supreme Court was denied December 24, 1968.