[Civ. No. 33547. Second Dist., Div. One. July 22, 1969.]

FRANK R. GOODMAN et al., Cross-complainants and Respondents, v. NELS G. SEVERIN, Cross-defendant and Appellant.

Irsfeld, Irsfeld & Younger and Charles W. Stoll for Cross-defendant and Appellant.

Burnstein & Abramovitz, Robert C. Burnstein and Sandra J. Shapiro for Cross-complainants and Respondents.

LILLIE, J.—Respondents were given a money judgment against appellant, less a designated credit in the latter's favor, as damages for appellant's breach of an agreement which assertedly obligated him to purchase stock pledged by respondents to Bank of California (plaintiff in the main action) for a price sufficient to exonerate respondents' indebtedness to plaintiff bank upon demand of him to do so. The judgment also provided that appellant pay reasonable attorney's fees incurred by respondents in defending the main action initiated against them by plaintiff bank. The principal issue on this appeal from the judgment is the legal effect of the agreement, dated August 5, 1963, including the legal consequences flowing from appellant's breach; more specifically, whether the agreement was one of guaranty (as contended by appellant) or of indemnity as determined by the court below. Subsidiary thereto is the further contention that due to its asserted ambiguity the trial court erred in refusing to admit extrinsic evidence to interpret the instrument which would have established the contractual relationship thereunder claimed by appellant, namely, that of guarantor and principals.

The events leading up to the filing of the main action by Bank of California and the cross-demands here adjudicated are hereinafter summarized: In November of 1961 respondents owned a 7.25 percent interest in Palomar Mortgage Company, consisting of approximately 108,000 shares, and were officers of that corporation; appellant owned approximately 27.2 percent of Palomar's outstanding stock, being president and chairman of its executive committee. In the summer of 1963 respondents were indebted to Central Valley National Bank

on a personal note, secured by a pledge of all their Palomar stock, in a sum approximating $500,000 which respondents, by sales of some of the pledged stock and other payments, had reduced to approximately $481,000. When Central Valley called the balance of the loan in June of 1963, respondents were unable to meet such demand. Since the market value of the pledged stock was then sufficient to discharge respondents' loan entirely, they were advised by Central Valley of its intention to sell such collateral unless payment of the full balance of respondents' indebtedness was made by August 5, 1963.

The problem was then brought to the attention of appellant who was concerned over the effect of a forced (and large) sale of stock upon his own Palomar holdings and that of other shareholders. Efforts by appellant to obtain a loan for respondents from other banks proved futile in the absence of a guarantee from appellant which he refused to give "as a matter of long standing practice." A loan (subject to the main action) was eventually obtained from Bank of California for respondents by one Samuelson, a partner in the accounting firm employed by Palomar. In the principal sum of $500,000, the loan was secured by 105,160 shares of Palomar stock, the written guarantees of respondents' spouses and appellant's agreement dated August 1, 1963, whereby he undertook to purchase the pledged stock at a price ($525,800) sufficient to discharge respondents' obligation in full if they defaulted. The above principal sum loaned by plaintiff was then disbursed to Central Valley who retained the balance still owed by respondents and remitted the remainder ($18,964.74) to respondents.

Thereafter respondents' attorney prepared the agreement herein which, as earlier stated, was construed contrary to appellant's asserted interpretation and resulted in this appeal. Appellant executed the document thus presented on August 5 after deleting a goodly portion thereof, initialing the parts stricken. As will appear, appellant argues that such deletions rendered the document ambiguous and thus made necessary the admission of extrinsic evidence in aid of its meaning; it is also claimed that appellant's deletions removed all language which would otherwise make the agreement one of indemnity. Be that as it may, as unaltered, the agreement provided inter alia that appellant would "purchase said stock for at least the then unpaid balance of the principal owed by [respondents] to Bank together with the accrued interest

thereon and other appropriate and reasonable costs owed by [them]." Likewise undeleted was a recital that appellant was "desirous to protect the value of his aforesaid stock, as well as the interests of all other shareholders of said mortgage company, and to secure his position as the owner of approximately 27.2% of the outstanding common stock of Palomar Mortgage."

Although respondents' note was thereafter reduced by the release and sale of certain shares of the pledged stock, on February 6, 1964, respondents defaulted on an interest payment. Subsequently Bank of California demanded that appellant purchase the remaining pledged stock still unsold, pursuant to the August 1 agreement, in payment of principal due from respondents ($455,609.17) and accrued interest ($22,704.51). Appellant failed to do so; upon such failure, Bank of California conducted a pledge sale at which all parties were in attendance. Appellant bid $2.25 per share, the highest bid there made for all of respondents' shares, which the Bank accepted. The net proceeds ($221,040) were credited to respondents' note, first to interest and then to principal, reducing the principal balance to $257,273.70.

Thereafter, Bank of California commenced the main action against respondents and their spouses on respondents' note, appellant being joined as a defendant under the agreement of August 1, 1963, to purchase the pledged stock. On motion for summary judgment, plaintiff was given judgment in the amount prayed for ($257,273.70) plus interest and attorneys' fees; as against appellant, a stipulated judgment was rendered for the above principal balance due under respondents' note plus interest. Subsequently the cause proceeded to final disposition on the cross-demands discussed above. Since respondents in the interim had paid $250,000 to plaintiff bank on account of its judgment, their cross-complaint sought reimbursement from appellant in that amount. From the reimbursement thus awarded, in addition to interest and attorneys' fees, the trial court gave appellant a credit of $11,391.50 representing the value of stock and cash dividends which respondents failed to deposit with plaintiff bank pursuant to the agreement of August 5.

As noted at the outset, appellant's principal contention asserts that the trial court erroneously found against his claim that he was merely a guarantor of respondents' obligation to plaintiff bank. As executed, the subject agreement reads in pertinent part as follows (italics being added) : ". . .

Whereas, Farrer [both respondents being so designated] is presently the owner of 105,160 shares of the common stock of Palomar Mortgage Company; and,

"WHEREAS, SEVERIN is the owner of 404,481 shares of common stock of said mortgage company and is the President of said company as well as the Chairman of the Board of Directors of said company; and,

"WHEREAS, FARRER proposes to borrow from the Bank of California, hereinafter called Bank, the sum of Five Hundred Thousand Dollars ($500,000.00) and to execute his promissory note therefor and to pledge his aforementioned stock as security for said loan; and,

"WHEREAS, said BANK will make said loan only upon the condition that SEVERIN will, if called upon by said Bank, purchase the aforesaid stock of FARRER pledged to said Bank to secure said loan; and,

"WHEREAS, SEVERIN has agreed that he shall so purchase; and,

"WHEREAS, the value of the aforesaid stock owned by SEVERIN, as well as the stock owned by all other shareholders of the aforesaid mortgage company, will be impaired in the event that the stock of FARRER which is being pledged as aforesaid is sold to the public or to any other person than SEVERIN; and,

"WHEREAS, SEVERIN desires to protect the value of his aforesaid stock, as well as the interests of all other shareholders of said mortgage company, and to secure his position as the owner of approximately 27.2% of the outstanding common stock of Palomar Mortgage.

"Now, THEREFORE, IT IS AGREED AS FOLLOWS:

"Severin hereby acknowledges that he is familiar with the terms of that certain promissory note dated August 1, 1963 payable to the Bank of California, or its order, in the principal sum of $500,000.00 executed by Richard C. Farrer and Frank R. Goodman, a copy of which is marked Exhibit A and attached hereto as if the same were again set forth in full herein as well as the agreement described as a 'General Pledge Agreement' executed by the aforesaid Farrer and Goodman, a copy of which is attached hereto and marked Exhibit B. In consideration of the loan made by the Bank of California to Farrer, the mutual promises herein contained, the sum of $10.00, receipt of which is hereby acknowledged and for other valuable and sufficient consideration, Severin hereby agrees

that in the event said Bank exercises its rights under the agreement heretofore entered into by and between Severin and the Bank in connection with his purchase of the stock of Farrer pledged to secure the loan as aforesaid, *he shall within the time specified in said agreement perform faithfully thereunder and shall purchase said stock for at least the then unpaid balance of the principal owed by Farrer to Bank together with the accrued interest thereon and other appropriate and reasonable costs owed by Farrer to said Bank in connection with the promissory note and pledge agreement which has been appended hereto as Exhibit A and Exhibit B respectively,* provided, however, the obligation of Severin hereunder by virtue of this paragraph shall. not exceed his obligation to the aforesaid Bank pursuant to his agreement with said Bank.

"Farrer agrees that he shall pay the interest on said note when the same becomes due. He further agrees that in consideration of Severin's agreements herein, he shall deposit with the said Bank as further security any and all stock dividends including but not limited to the 4% stock dividend payable by Palomar Mortgage Company to Farrer on or about the 27th of September, 1963 as further security for the loan made by the Bank to Farrer. Farrer further agrees that in the event he causes any of the shares of stock so pledged by him to said Bank to secure his obligations to said Bank to be sold, that he shall cause the net purchase price received by him to be paid to said Bank and that said net purchase price shall be applied to the then current principal balance outstanding for the purposes of reducing Farrer's obligation outstanding to said Bank. It is further agreed that any reduction in the principal balance outstanding shall inure to the benefit of Severin as between Severin and Farrer and consequently Severin's potential obligation under this agreement shall be diminished in that the potential amount to be paid by Severin to said Bank for the purchase of said shares of stock under Severin's agreement with said Bank or under this agreement *shall be diminished by that sum paid by Farrer prior to the time that Severin is called upon to purchase the then remaining shares of Farrer's stock securing the balance of the principal obligation of Farrer to said Bank. . . ."*

As indicated in the italicized portions of the agreement, significantly separated from each other by considerable (but related) written material, appellant in two instances undertook to purchase the stock so that the principal balance

owed by respondents to the bank might thereby be liquidated. Manifestly inherent in such undertaking is a promise to purchase the pledged stock at a specified price, namely, in an amount sufficient to satisfy the obligation due the bank; since respondents' obligation eventually totaled in excess of $470,000, it clearly could not be satisfied by the purchase of the stock at a pledge sale in an amount less than one-half of the above indebtedness. ██ It has been said that " 'in indemnity contracts the engagement is to make good and save another from loss upon some obligation which he has incurred or is about to incur to a third person, and is not, as in guaranty and suretyship, a promise to one to whom another is answerable.' [Citation.]" (*Somers* v. *United States Fid. & Guar. Co.*, 191 Cal. 542, 547 [217 P. 746].) ██ The court continued: " 'The essential distinction between an indemnity contract and a contract of guaranty or suretyship is that the promisor in any indemnity contract undertakes to protect his promisee against loss or damage through a liability on the part of the latter to a third person, while the undertaking of a guarantor or surety is to protect the promisee against loss or damage through the failure of a third person to carry out his obligations to the promisee.' [Citation.]" (P. 547.) ██ If we apply the foregoing to our case, the agreement being viewed as one of indemnity, appellant undertook to protect respondents against loss or damage through their liability to the third person Bank of California; on the other hand, the facts of the present case do not come within the above definition of a contract of guaranty since there is no "failure of a third person to carry out his obligations to the promisee."

Although appellant cites the *Somers* case, no mention is made of the portion thereof just quoted. Indeed, as he expressly concedes, no contention is here made that the *August 5* agreement standing alone is a guarantee agreement (App. Reply Br. p. 9). Instead, it is argued, the August 1 contract between appellant and plaintiff bank is a form of guarantee similar to that found in *Bank of America etc. Assn.* v. *Lane Mortg. Co.*, 18 Cal.App.2d 431 [63 P.2d 1189], and there is nothing in the subsequent agreement, dated August 5, which alters such guarantor-principal relationship. The two cases are clearly distinguishable. Upon payment of his obligation to the plaintiff bank in that case, Lane succeeded to the latter's position against the principal obligors (Mr. and Mrs. Carl), including the benefit of the security, in the form of trust deeds, held by the bank. ██ In the present case, how-

ever, the agreement expressly provides that respondents were to be entirely discharged from any further liability arising under the transaction.[1] Too, in consideration of the foregoing release of respondents from further claims against them, appellant became the absolute owner of the stock upon purchase thereof pursuant to the several engagements. That he exercised such right is undisputed and appears from the following events: Appellant borrowed from plaintiff bank the funds used by him for the purchase of the stock at the pledge sale, pledging the same stock as security for the loan. Thereafter appellant entered into a sale and option agreement with another lending concern whereunder the latter was given an option to purchase all of appellant's stock in Palomar, including that purchased at the pledge sale, for a price 50 percent greater than that paid by him at such sale; and, significantly enough, appellant warranted in such agreement that he was the owner of the subject securities. None of the above circumstances imports the existence of a guarantor-principal relationship whereby, under statutory law, appellant could have compelled respondents to pay the obligation when due and before he had paid it himself. (Civ. Code, § 2846; see *Karn* v. *Wills,* 50 Cal.App.2d 604, 606-607 [123 P.2d 640].)

 Appellant's claim is also unsustainable upon application of the following principle: "An indemnity agreement is to be construed like any other contract with a view to determining the actual intention of the parties; no artificial rules apply." (*Fidelity & Deposit Co.* v. *Whitson,* 187 Cal.App.2d 751, 756 [10 Cal.Rptr. 6].) With respect to the parties' intentions, and likewise governing here, is the judicially recognized assumption that " 'parties to a contract best know what was meant by its terms, and are the least liable to be mistaken as to its intention . . . that whatever is done by the parties contemporaneously with the execution of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the intention of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them

[1]A pertinent portion of the August 5 agreement, not hereinabove quoted, reads: "Farrer makes no representation as to the fair market value of said shares at this time nor at any subsequent time and that the total obligation of Farrer to Severin in any and all instances with regard to the transaction herein set forth . . . shall not exceed that as defined by this paragraph and shall be fully satisfied when Farrer has performed hereunder."

to resort to law, and one of them seeks a construction at variance with the practical construction they have placed upon it. . . .' '' (*Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 762 [128 P.2d 665].)

Respondent Farrer testified that when they were preparing to execute the agreement appellant made this statement: ''As you know, Dick, there is no personal guarantee on the part of myself or my wife, and . . . I am willing to buy the stock if the bank calls on me to purchase the stock, but I do not want you to be able to call on me to purchase the stock; and further, when I get the stock, I want to own the stock. I don't want there to be any other claims that Frank Goodman or you might have against that stock.'' As already shown, appellant thereafter purchased the stock at the pledge sale and subsequently optioned it for resale, warranting that he was the owner and not a mere pledgee. ▪ It was aptly noted in *Crestview Cemetery Assn.* v. *Dieden,* 54 Cal.2d 744, 754 [8 Cal.Rptr. 427, 356 P.2d 171], that '' 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.''

▪ It must, accordingly, be concluded that the trial court correctly construed the agreement to be one whose legal consequences are set forth in the findings and the ensuing judgment based thereon.

▪ Pronouncements in the *Crestview* case are also dispositive of appellant's next contention that the trial court erred in refusing to admit extrinsic evidence in aid of interpreting both the August 1 and August 5 agreements. ▪ In this connection appellant properly asserts that where two or more written instruments are executed contemporaneously, with reference to each other, for the purpose of attaining a preconceived objective, they must all be construed together and effect given if possible to the purpose intended to be accomplished; and this principle controls whether each of the several instruments was signed by all or only some of the parties to the transaction. (*Mayers* v. *Loew's, Inc.,* 35 Cal.2d 822, 827 [221 P.2d 26].) Reference is made by appellant to certain portions of the August 5 agreement which are claimed to be ambiguous and uncertain. ''But,'' as asked in the *Crestview* case, ''the question involved . . . is ambiguous to whom? ▪ Words frequently mean different things to

different people. Here the contracting parties demonstrated by their actions that they knew what the words meant and were intended to mean.'' (*Supra,* 54 Cal.2d at p. 754.) The above reasoning also applies to appellant's further point that the deleted portions of the same agreement (dated August 5) altered the basic contractual undertakings of the parties and are contrary to the court's interpretation of the subject engagements.[2] Finally, it should be pointed out that the court did permit appellant to testify as to his intentions although, in light of his prior statements, such testimony was not accorded the weight he claims it deserved. Also appellant was advised that he could lay a foundation to establish the claimed ambiguity; in response thereto, it appears, the laying of such foundation was never attempted, nor was there any offer of proof relating to the effect of such proffered extrinsic evidence.

The judgment included an award of attorneys' fees ($15,000) as part of respondents' costs in defending the main action instituted by plaintiff bank. Such award is defended by respondents upon the theory that the defense of the main action was proximately made necessary by appellant's breach of the agreement to purchase the stock and exonerate their liability to plaintiff bank. Cited in support of their position is *Prentice* v. *North American Title Guar. Corp.,* 59 Cal.2d 618 [30 Cal.Rptr. 821, 381 P.2d 645], which decision, in turn, is followed in *Ruth* v. *Lytton Sav. & Loan Assn. of Northern Cal.,* 266 Cal.App.2d 831 [72 Cal.Rptr. 521]. Neither case, in our view, is here applicable, since they deal with the tort measure of damages to an award of counsel fees. In our case, the main action was not predicated upon appellant's negligence but rather, upon his asserted breach of contract. Certain portions of the agreement calling for the payment of counsel fees were deleted; with such deletion, the contract is completely silent as to appellant's obligation for the instant element of costs in the event of default. Subdivision 3 of section 2778, Civil Code, provides that ''An indemnity against claims, or demands, or liability, expressly, or in other equivalent terms, embraces the costs of defense against such claims, demands, or liability incurred in good faith, and in the exercise of a reasonable discretion.'' Under subdivision 4 of the

---

[2] The provisions deleted would have required appellant to purchase the stock upon respondents' demand even though no demand therefor was made by plaintiff bank; they would also have obligated appellant to pay all attorneys' fees and costs incurred by respondents upon his failure to perform the agreement.

same section, ''The person indemnifying is bound, on request of the person indemnified, to defend actions . . . but the person indemnified has the right to conduct such defenses, if he chooses to do so.'' Rather recently, in *Buchalter* v. *Levin*, 252 Cal.App.2d 367 [60 Cal.Rptr. 369], it was stated with respect to subdivision 4, *supra*, that absent some contractual privilege so to do or some showing of sufficient justification, an indemnitee ordinarily may not refuse to join or cooperate with the indemnitor's proffered defense and still recover his separate counsel fees. (P. 371.) In the above and other respects, *Buchalter* is dispositive of the instant point. ▮ As held in that case, an indemnitee (and respondents claim to be in such category) may not recover the expenses of his defense to an action arising out of the matters indemnified unless the agreement so provides or unless there is pleading and proof which brings the claim therefor within the provisions of subdivision 4, section 2778, Civil Code. In the instant proceeding there was neither such pleading nor proof.

▮ There is no merit to appellant's further point that since respondents materially breached their agreement to pay their debt to plaintiff bank, his performance was excused. The whole basis of the August 5 agreement was that respondents might default, in which event appellant's obligation to purchase the stock then arose. Such was the clear operational basis of the agreement.

▮ Finally, appellant urges that the judgment, as entered, is uncertain and contradictory. Provision is therein made for restraints against plaintiff bank from further enforcing its judgment on the complaint (in the main action) against respondents, such injunctive relief being predicated upon a conclusion of law that when plaintiff elected to secure judgment against appellant, a novation upon the note was accomplished with respect to respondents' obligation to plaintiff. In view of the above, it is argued that respondents' payment of $250,000 to plaintiff bank was a ''voluntary'' one, and an indemnitor is not liable for voluntary payments made by his indemnitee. (46 Cal.Jur.2d p. 336.) While the point is not ''patently specious,'' as urged by respondents, we do not feel that the circumstances of this case require a reversal for the reasons now urged, particularly since plaintiff bank was not a party to the cross-complaint and could not be bound by the conclusion of law in question.

For the foregoing reasons the Judgment on Cross-Complaint is modified by deleting and striking the following on

page 2 starting at line 27 and ending on line 31: ''and reasonable attorneys fees incurred in defending the within action against plaintiff in the sum of Fifteen Thousand Dollars ($15,000.00) as damages upon the Fifth Cause of Action, as amended, of the cross-complaint on file herein.'' In all other respects the judgment is affirmed. Respondents will recover their costs on appeal.

Wood, P. J., and Thompson, J., concurred.